## FRASER v. NAUTS, Collector of Internal Revenue.

(District Court, N. D. Ohio, W. D. September 12, 1925.)

No. 3013.

1. **Internal revenue** ⬳38—Government, seeking to impeach as mala fides written contract, has burden of producing clear and convincing proof.

Government, seeking to impeach as mala fides a written contract, in so far as it affects income tax of one of parties thereto, must produce proof that is clear and convincing rather than mere preponderance.

2. **Internal revenue** ⬳5 — Device to avoid burden of revenue acts may be resorted to if effectuated by legal means.

Device to avoid or minimize burden of revenue acts may be resorted to if effectuated by legal means.

3. **Statutes** ⬳245—Revenue statutes not extended by implication, and doubts resolved against government.

Taxing statutes may not be extended by implication beyond clear import of language used, nor may their operations be enlarged to embrace matter not specifically pointed out; doubts being resolved against government.

4. **Internal revenue** ⬳7—Contract for sale of lumber business, including good will valued at $100,000, held not illegal attempt to evade income taxes.

Bona fide contract for sale of lumber business and lease, by which good will of business was valued at $100,000, held not impeachable by government as mala fides and illegal evasion of income tax on such $100,000.

At Law. Suit by Harold W. Fraser, as executor of the estate of William T. Hubbard, deceased, against Charles H. Nauts, Collector of Internal Revenue. Decree for plaintiff.

Fraser, Hiett & Wall and Marshall, Melhorn, Marlar & Martin, all of Toledo, Ohio, for plaintiff.

D. L. Sears, Asst. U. S. Atty., of Toledo, Ohio, and Mr. Ward, Dept. of Internal Revenue, for defendant.

KILLITS, District Judge. [1] As the government, in this case, to succeed in its defense, must impeach, as in mala fides, a written contract between the plaintiff's testator and the Willys-Overland Company, it is illuminating to advert, at the outset of this memorandum, to the established principle respecting the quantum of proof requisite to such an undertaking; i. e., that the necessary proof, far from a mere preponderance, must be clear and convincing.

As the case is pleaded and presented, if the contract is sustainable with the application of this principle, relief such as is asked by the plaintiff must be afforded.

With intent of the parties to the contract, then, under scrutiny, it becomes important, as elements of interpretation of such intent, to consider the respective situations of these contracting parties at the time of execution.

The date is October 6, 1919, a time when, as the proof shows and as is well known, the transportation system of the country was under great demoralization resulting from war conditions, to the serious embarrassment of manufacturers using large quantities of raw materials, not produced in the vicinity of their operations. Lumber, as a bulky commodity, was definitely a raw material difficult of ready and quantitative procurement. The Willys-Overland Company was a very large consumer of hardwood lumber, under circumstances which made it willing, at times, to pay even exorbitant prices for quick delivery; and it was, at the date in question, in need of such commodity to a very large amount. In addition, the current business of this manufacturer made highly desirable an immediate enlargement of its storage and shipping facilities.

The decedent, plaintiff's testator, Hubbard, had been for a long time a dealer in hardwood lumber. He had in his yards a very large amount of this merchandise, in an assortment of quality and dimensions which was adaptable to the Willys-Overland Company's use. Besides, he enjoyed a long lease of a yard whose facilities met substantially the company's storage and shipping needs.

Hubbard had been negotiating with the Willys-Overland Company for a sale of his business, and had fixed his aggregate price at $525,000, which the company was preparing its mind to accept. At this juncture he was stricken with what was feared to be a mortal disease. In the hospital, with surgeons in the hall, impatient to commence a necessarily immediate and hazardous operation, Hubbard, himself believing that death was imminent, had but time to place the conclusion of negotiations in the hands of his counsel as his attorneys in fact, clothing them with plenary powers respecting the present matter.

[2, 3] Naturally, an effort was made by Hubbard's representatives to minimize, as far as possible, the burden of federal taxation. It is the opinion of this court that, while such an idea moving to what was done by way of apportioning the elements of sale to the Willys-Overland Company should be considered as one of the factors of possible mala fides, yet it is relatively unimportant unless otherwise pretty definite impeaching proof is found. A device to avoid the burden of revenue acts may be resorted to, if effectuated by legal means (United States v. Isham, 17 Wall. 496, 21 L. Ed. 728); wherefore, after all, the inquiry is not as to the object, but of the legal sufficiency of such means. In this inquiry enters, in behalf of plaintiff's position, the established rule that the provisions of the taxing statutes may not be extended by implication beyond the clear import of the language used therein, nor may the operations of statutes be enlarged so as to embrace matter not specifically pointed out, and the further principle that doubts upon these questions are to be resolved against the government. Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211.

[4] The revenue law recognized good will, as its value was ascertainable as of March 1, 1913, to be a species of property subject to transfer by sale free of revenue tax, and regulations were promulgated involving formulæ whereby values of such intangible property as of that date might be computed. Under these circumstances a written contract of sale was made and executed between Hubbard, through his attorneys in fact, and the company, of the lumber, for a stated consideration of $250,000, and of the good will as of March 1, 1913, as of the value of $100,000, and also of a sublease of the yards and shipping facilities for ten years at $17,500 per year rental. The contract required Hubbard to cease doing business as an individual, except for the completion of current contracts with third parties.

Hubbard survived the transaction and his operation but a few months, carrying on, for a short time, business at the old location, later forming a corporation to engage in the hardware lumber business at another point, with about two-thirds of the stock interest in himself.

The Willys-Overland Company, for a considerable period, used the yard leased under the contract, both for the continued storage of the lumber bought, and extensively for shipping purposes, and for the storage of its product, finally disposing of the lease. It never used its good will interest, if, in fact, that intangibility had a practical use; and it never questioned whether Hubbard fully complied with the trade restriction imposed upon him by the contract. On its books it entered the transaction merely as a merchandise purchase for $525,000.

Hubbard, for 1919, returned a net income which involved him in an income tax of $80,061.54, not accounting for the $100,000 received for good will. Later, the government, going no farther into the good faith of the transaction, demanded accountability for the $100,000 in question, assessing an additional tax for 1919 of $67,654.95, which was paid by the Hubbard estate under protest; this suit following in an effort to recover such payment.

The government has so restricted the situation as to raise in this action nothing but the question whether the good will as of March, 1913, was actually sold, or whether to include that as an item of sale was to indulge an illegal effort to defraud the government of revenue. A regulation formula was introduced in evidence, which, applied to the condition of the Hubbard business prior to March, 1913, justifies a conclusion that this good will then had a valuation for tax reduction office of about $102,000, although the government contends here, not very strenuously, that, upon another basis of calculation, its fair value was but $62,370.55.

The lumber was undoubtedly worth more than $250,000. To the Willys-Overland Company, then involved in its present necessities, it may have been worth a half a million dollars or more. There is some reason for the government's contention also that Hubbard breached his contractual restriction upon continuing in business under his individual name, for which the company may have had a right of action against him,

and which it never attempted to exercise; but, we repeat, the issue is the narrow one whether the good will was sold. On that point the contract is in the plainest possible terms. It clearly expresses a sale, and binds the contracting parties, respectively, to a transfer, which the Revenue Act expressly permitted to be the subject of consideration to the diminution of the amount of the sales tax. Between the parties to the contract, then, no question of good faith is possible on this point; neither could be heard to question that the Willys-Overland Company paid $100,000 for this item, and thereby acquired it from Hubbard; and, as we have suggested, and the evidence shows, and we must hold, that the valuation was not exorbitant.

The government, although but a third party, directly, of course, is in a position to question the good faith of the transaction, because of its taxing interest. However, presumptions run strongly in favor of the contract as an expression of the actual intent of the parties, and an exhibition of what in fact was done; the execution thereof being shown.

Hubbard had a clear legal right to fix a value on each item of property he had to sell, whether his choice was to establish a depreciated or exorbitant figure. The government concedes, by its legislation, that the good will in question was a disposable asset. He was justified in law to place upon his merchandise a low or inadequate price as an inducement to obtain a market for his less salable good will. Likewise, it was within the noncriticizable discretion of the other party to meet his terms in the purchase of something which it could not use, to be able thereby to satisfactorily acquire something greatly to be desired. Therefore, by means entirely legal, taxes which otherwise might have been imposable were avoided.

It is plain that, if the tax question were not here, no one would dream that the contract was fraudulent. That question involved is not sufficient to render fraudulent a transaction otherwise unimpeachable.

It is the court's judgment that the government has not succeeded in meeting the presumptions facing it with proof sufficient to impeach the good faith of the transaction, and that the plaintiff should recover its protested payment with interest.