**BRUNTON v. COMMISSIONER OF INTER-
NAL REVENUE.**

No. 6046.

Circuit Court of Appeals, Ninth Circuit.

July 14, 1930.

Lynden Bowring, of Los Angeles, Cal., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., E. Riley Campbell, Sp. Atty., Bureau of Internal Revenue, and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, both of Washington, D. C., and John Vaughan Groner, Sp. Asst. to Atty. Gen., for respondent.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge.

Much of the record is irrelevant to the question submitted, and a brief statement of the facts, none of which is controverted, will suffice. Appellant, as executrix of the estate of Robert Brunton, deceased, complains of an assessment of income taxes against decedent for 1921, originally made by the appellee and later approved by the Board of Tax Appeals, from whose order the appeal is prosecuted. The precise question is whether a stated gain or profit realized by the decedent upon the sale by him of certain corporate securities referred to as voting trust certificates, representing 1,231 shares of the capital stock of the Robert Brunton Studios, Inc., was returnable for assessment purposes for the year 1921, as appellee held, or for 1922, as appellant contends.

On October 20, 1921, the deceased gave to one Levee a written option to purchase these certificates, together with 125 shares of the stock of the same corporation not in the voting trust, the same to be exercised not later than December 20, 1921. Before the time elapsed the deceased learned that in all probability Congress would amend the law so as to reduce the rates of taxation on incomes for the following year, but whatever may have been the motives or actuating considerations of the parties, the option was permitted to lapse on December 20th, and on that day a new contract was made, under the terms of which a sale of both items of securities was agreed upon at the same prices specified in the option. With the 125 shares, admittedly sold outright and forthwith delivered and paid for, we are not concerned. The trust certificates for the 1,231 shares decedent agreed to sell and Levee to buy at $45 per share net, the "purchase to be consummated and said purchase price paid on the 28th day of March 1922." The certificates were to be and, in fact, were immedi-

ately delivered to Levee, regularly indorsed in blank by the deceased, but with the stipulation that, until full payment therefor was made, they should not be "registered as transferred upon the transfer books" of the trustees. And, at the same time, the deceased agreed to give and gave Levee an unlimited "irrevocable proxy and power of attorney (with full power of substitution in whole or in part) in any matter and for any and all purposes, to vote upon the said Trust Certificates and otherwise control the action of said Trustees, and their agents, with respect thereto, and the beneficial interest in said stock represented thereby, and to the same extent as the first party might or could do if this agreement had not been made," to remain in full force to and including March 28, 1922. Pursuant to another provision of the agreement, Levee simultaneously deposited with the bank, as "pledge holder," $48,-150, par value, Liberty Loan bonds, with partially matured interest coupons attached and a promissory note of a third party for $8,000, with guaranty of payment by Levee indorsed thereon, as collateral security, for the benefit of the decedent and for his assurance that he (Levee) would fully perform his obligations and pay the purchase price as stipulated. By the terms of the agreement authority also was expressly conferred upon the pledge holder to liquidate, and apply, the proceeds of the collateral in case of any default upon Levee's part. In fact, the full purchase price was paid by Levee, in money, on March 28, 1922.

■■■ It is to be conceded that the contract is not to be deemed ineffectual merely because the purpose of the decedent may have been to avoid the heavier tax rate of 1921. United States v. Isham, 84 U. S. (17 Wall.) 496, 21 L. Ed. 728; Haverty v. United States (D. C.) 286 F. 985; Fraser v. Nauts (D. C.) 8 F.(2d) 106. But in interpreting an equivocal transaction motives may be considered as bearing on the real nature thereof. Wehe v. McLaughlin (C. C. A.) 30 F.(2d) 217; Texas & N. O. R. Co. v. Brotherhood, etc. (U. S. Sup. Ct. May 26, 1930), 50 S. Ct. 427, 74 L. Ed. 1034. In the decedent's motive we probably find explanation for that phase of the contract by which it was attempted to give to the transaction the appearance of a sale on March 28, 1922, rather than on December 20, 1921; but, notwithstanding such purpose and effort, we must consider what in substance he actually did and the legal effect thereof. In terms, at least, he neither retained title to the certificates nor reserved any power with respect thereto. He not only delivered actual possession thereof to Levee, but by "properly and regularly" indorsing them in blank, and by giving Levee the "irrevocable proxy and power of attorney," he invested him with authority up to March 28, 1922, to do all that he himself as absolute owner could have done had the agreement not been made, with the sole exception of having the transfer noted on the trustees' records. Having rightful possession of the certificates duly indorsed, and being vested with such power over them, it is difficult to see on what ground it could be held Levee did not, on December 21st, and thereafter in 1921, have all the rights of ownership, including the right to sell and transfer the title. Nor can it be said that the decedent had received no consideration on account of the purchase price. He had Levee's absolute promise to pay—fully equivalent to his promissory note—secured by collateral of a face value in excess of the total price of the certificates, and the major part thereof—nearly 87 per cent. of the entire purchase price—being of such character that it might well have been considered the equivalent of approximately that amount of cash. That the contract thus held by decedent was a new and valuable asset, received in 1921, is so manifest that it is scarcely necessary to refer to the agreed fact that upon it as collateral the decedent, early in January, 1922, borrowed from the pledge holding bank the sum of $30,000. Had the decedent kept his accounts upon a cash, as distinguished from an accrual, basis, the appellant's arguments would be more persuasive, although it would seem to be well settled that, even in such a case, it is not always essential that income be received in money. Peabody v. Eisner, 247 U. S. 347, 38 S. Ct. 546, 62 L. Ed. 1152; Holmes Federal Taxes (6th Ed.) p. 490. See, also, United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180; Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186; Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906; Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079. Without any reference to the record, we find it stated in appellant's brief that decedent's accounts were not kept on the accrual basis, but in respondent's brief it is positively asserted and reiterated that there is no basis in the record for appellant's statement, and, upon a search, we have been unable to find one. To succeed, it was necessary for the appellant to show before the Board of Tax Appeals, as well as here, that appellee erred in making the additional

assessment, and the burden was therefore upon her to prove the cash basis, if by her that was deemed to be a material consideration. United States v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347; Lucas v. American Code Co., 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538; Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385. Hence, presuming, as we must, that the accounts were kept upon an accrual basis, there would seem to be little room for doubt of the propriety of the assessment, for, if we accept appellant's theory of the transaction of December 20th, the decedent acquired in 1921 the absolute obligation of Levee to purchase these certificates at a price adopted by appellee as the basis for his computation of the tax, which obligation was secured not only by the large amount of United States Liberty bonds and a promissory note, but by the full value of the certificates themselves.

With apparent confidence appellant cites the recent decision (February 24, 1930) of the Supreme Court in Lucas v. North Texas Lumber Company, 281 U. S. 11, 50 S. Ct. 184, 74 L. Ed. 668. In that case the North Texas Company, in the latter part of 1916, gave to the Southern Pine Company an option to purchase certain lands. On December 30, 1916, the latter company, gave notice that it would exercise the option, but the papers were not prepared or the transfer effected until early in January of the following year. The court said: "An executory contract of sale was created by the option and notice, December 30, 1916. In the notice, the purchaser declared itself ready to close the transaction and pay the purchase price 'as soon as the papers were prepared.' Respondent did not prepare the papers necessary to effect the transfer or make tender of title or possession or demand the purchase price in 1916. The title and right of possession remained in it until the transaction was closed. Consequently unconditional liability of vendee for the purchase price was not created in that year."

The case would therefore seem to be substantially different from the one at bar. Here the liability of the vendee for the purchase price was unconditional, the performance of this unconditional obligation was abundantly secured, and it was created in 1921. And, furthermore, in 1921, actual possession of the property sold was delivered to the vendee, who was at the same time vested with substantially all the rights and powers incident to ownership.

Affirmed.