## EATON v. WHITE, Commissioner of Internal Revenue.

### No. 2868.

Circuit Court of Appeals, First Circuit.

April 18, 1934.

Charles C. Cabot, of Boston, Mass. (James W. Mudge and Ropes, Gray, Boyden & Perkins, all of Boston, Mass., on the brief), for appellant.

Helen R. Carloss, Sp. Asst. Atty. Gen. (Sewall Key and Lester L. Gibson, Sp. Asst. Attys. Gen., and Francis J. W. Ford, U. S. Atty., and J. Duke Smith, Sp. Asst. U. S. Atty., both of Boston, Mass., on the brief), for appellee.

Before WILSON and MORTON, Circuit Judges, and LETTS, District Judge.

LETTS, District Judge.

This is an action in contract to recover the sum of $10,744.15, with interest, which the plaintiff claims was illegally assessed as a tax upon his income for the year 1929 and which was paid by him under protest. The court below, upon an agreed statement of facts, entered judgment for the defendant, with costs.

The nature of the controversy is such that it is unnecessary to deal separately with the individual assignments of error. We will come at once to the meat of the issue between the parties.

On November 28, 1928, the plaintiff and his two brothers caused to be formed a Massachusetts corporation called The Coleman Company. There then were issued, for a cash consideration of $300, 1,050 common shares without par value. On December 12, 1928, the name of this corporation was changed to Thompson's Spa, Inc., and two days later 150,950 additional shares of common stock were issued to the Eatons for which they paid the corporation $15,000. Thus as of December 14, 1928, the corporation had a paid-in capital of $15,300 with 152,000 common shares outstanding, of which the plaintiff owned 50,667. For the sake of brevity, we will hereafter refer to the corporation, Thompson's Spa, Inc., simply as the corporation.

The three Eaton brothers owned as equal copartners a restaurant business in Boston known as Thompson's Spa. They also owned all the shares of The Sumner Company which owned the real estate where the business was conducted. As of December 3, 1928, and prior to the organization of the corporation, the Eatons had entered into an agreement with Hale, Waters & Co., security brokers. All the details of this contract would, if here stated, confuse, not clarify, the issue as many changes in the plan therein proposed were subsequently made. It is clear that the Eatons during this period were formulating plans to transfer the restaurant business and aforementioned real estate to a corporation, retaining a substantial interest therein, and to employ Hale, Waters & Co., to market, for a consideration, shares of the corporation to be issued for the conveyance of these properties, as well as to sell further shares of the corporation, preferred and common, to provide additional working capital.

On January 2, 1929, the brothers transferred the restaurant business to the corpora-

tion for 11,000 shares of its preferred stock in which plaintiff had a one-third interest. This stock was sold through Hale, Waters & Co., and a capital gain thereon reported representing the difference between the price received and the agreed cost basis to the partnership of the assets transferred. The full tax on this difference was paid.

On January 8, 1929, The Sumner Company transferred to the corporation the real estate occupied by the business and received therefor 16,000 shares of preferred stock of the corporation. These shares were distributed in liquidation of The Sumner Company to its stockholders, the Eatons, who in turn sold the same through Hale, Waters & Co., and reported the agreed capital net gain which represented the difference between the price received and the cost basis of the shares The Sumner Company held. The tax upon this capital gain was paid. For the purpose of this case, it was agreed between the parties that after the aforementioned transactions were completed, after the issuance and sale by the corporation of additional common and preferred shares and after the issuance of a block of common shares to Hale, Waters & Co., for services, the fair market value of the 152,000 common shares of the corporation, which the Eaton brothers had acquired by December 14, 1928, for approximately 10 cents per share, was now worth $10.70 per share at wholesale and $12 per share retail.

In view of the findings of the trial court and the issues which are before us, it is unnecessary to outline the details of computation, the errors therein, or reasons for the additional assessments aggregating $10,744.15, for which this suit is brought. It is sufficient that the parties have here recognized that this sum was improperly assessed and collected and should be recoverable by the plaintiff unless it appear from the whole transaction above outlined that the plaintiff did in fact receive a capital gain for the year 1929 so much in excess of that reported by him that he is still in a position of not having overpaid the tax justly due the government. In other words, the defendant contends that, conceding the invalidity of the basis given for the assessment of the $10,744.15, the plaintiff nevertheless owed a much larger sum in respect to the main transaction and cannot, therefore, now recover.

The only real issue in the case returns us then to a consideration of whether the plaintiff, in connection with the sale and liquidation of The Sumner Company and in connection with the sale of his interest in the partnership, reported his full capital gain or profit which was taxable under the law. This issue, under the agreed facts, narrows still further. Should there have been included in plaintiff's taxable income for 1929 the amount by which the market value of his common stock in the corporation, acquired in 1928 for approximately 10 cents per share, was enhanced by the sale to it in 1929 of the aforementioned properties through the transactions described?

The provisions of the Revenue Act of 1928 most directly re'ating to the issue here involved are as follows:

"Sec. 111. (a) *Computation of Gain or Loss.* Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in section 113 [section 2113], and the loss shall be the excess of such basis over the amount realized.

"(c) *Amount Realized.* The amount realized from the sale or other disposition of property shall be the sum of any money received p us the fair market value of the property (other than money) received.

"Sec. 113. (a) *Property Acquired After February 28, 1913.* The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property." (26 USCA §§ 2111 (a, c), 2113 (a).

The government of necessity rests its position upon the contention that the plaintiff, together with his two brothers, in a single and entire transaction sold their restaurant business and the real estate owned by The Sumner Company and received therefor the preferred stock of the corporation, which was converted into cash, and 152,000 shares of the common stock of that corporation of an agreed market value. The defendant in his brief lays considerable stress upon the provisions of paragraph 6 of the proposed agreement of December 3, 1928, between Hale, Waters & Co., and the three Eaton brothers. In this paragraph the Eatons undertake to cause a corporation, then in contemplation of organization, to enter into an agreement to acquire the assets of the restaurant business and in consideration therefor to deliver either to the Eatons or to The Sumner Company 152,000 shares of the corporation's common stock, as well as an undetermined number of additional preferred and common shares.

Had the original proposed method of carrying out the project been followed, it may well be that 152,000 shares of the common

stock would have been included in any consideration of the capital gain derived by the brothers or The Sumner Company from the transaction. There is little doubt that the parties sought to readapt and devise a plan under which the Eatons would not be required to pay a capital gain tax upon the interest which they were to retain in the business to be thereafter conducted as a corporation, instead of a partnership. With that we are little concerned. It is sufficient that the original plan of December 3d was subsequently radically changed. Not only was the device hit upon for the Eatons to acquire a common stock interest in the new corporation for a cash payment, which was consummated in 1928, but the plan was broadened to have the new corporation acquire the real estate held by The Sumner Company.

It should also be kept in mind that, while the instant case is a suit for a deficiency in 1929, it is undisputed that the 152,000 shares involved were acquired in 1928. In 1929, because of what was done, there was an appreciation in the value of those shares but that added value was never realized upon, nor do we know what part of it still existed following the events in the fall of that year.

The government has based its argument upon the character of the December 3d proposal, undertaking to disregard the subsequent alterations in both substantive plan and methods to be followed. Yet nowhere is there the slightest suggestion of illegality in the steps taken nor any claim of fraud. We are, therefore, concerned solely with the legal consequences not of what might have been done, not of what was proposed on December 3, 1928, but of that which was in fact done.

In the case of United States v. Merriam, 263 U. S. 179, 44 S. Ct. 69, 71, 68 L. Ed. 240, 29 A. L. R. 1547, the court said:

"On behalf of the government it is urged that taxation is a practical matter and concerns itself with the substance of the thing upon which the tax is imposed rather than with legal forms or expressions. But in statutes levying taxes the literal meaning of the words employed is most important for such statutes are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer."

Nor are we concerned, in the absence of any illegality or fraud, with the fact that a desire to minimize taxation may have been an active motive in the selection of one plan of procedure as compared with another.

In the case of United States v. Isham, 17 Wall. (84 U. S.) 496, 506, 21 L. Ed. 728, the court said:

"It is said that the transaction proved upon the trial in this case, is a device to avoid the payment of a stamp duty, and that its operation is that of a fraud upon the revenue. This may be true, and if not true in fact in this case, it may well be true in other instances. To this objection there are two answers:

"1st. That if the device is carried out by the means of legal forms, it is subject to no legal censure. * * * "

See, also, Brunton v. Commissioner (C. C. A. 9) 42 F.(2d) 81; Iowa Bridge Co. v. Commissioner (C. C. A. 8) 39 F.(2d) 777; Fraser v. Nauts (D. C.) 8 F.(2d) 106; Anna M. Harkness, 1 B. T. A. 127; R. L. Evans v. Com'r, 8 B. T. A. 543; Houston Bros. Co. v. Com'r, 21 B. T. A. 804, 813.

The case of Trust Co. of Georgia v. Rose (D. C.) 25 F.(2d) 997, 999, affirmed (C. C. A. 5) 28 F.(2d) 767, involved facts and issues in some respects closely analogous to the instant case. The trust company of Georgia was a member of a banking syndicate which underwrote an issue of stock of a new corporation at $35 per share. This was resold to the public at $40 per share. At the same time, the syndicate was permitted to subscribe for its own account, and not then to be sold, for a substantial block of the same stock at $5 per share. The Commissioner contended that the trust company had received a taxable profit or gain in the transaction equal to $30 per share on the 13,677 shares which it had been permitted to buy for $5 per share. The Commissioner contended that this value in the stock, although not then to be realized upon, was a taxable profit in the nature of compensation for underwriting services. In this case the District Court said:

"But it seems to me that the profit remains in it till realized by a sale or other conversion. That the market value of unpooled stock on August 26 was $40 is of no more consequence than the market value on December 31, or any other date. Property bought by a taxpayer is not valued to ascertain gain at the end of each month or year, but increment or loss in value stands unascertained till there is a sale or exchange. No taxable gain was realized in this stock by its mere purchase. It appears that portions of it have been sold since 1919, and tax paid on the ascertained profit as of the year of sale. This, I think, is the correct way to tax these

452

operations. It follows that the tax assessed and collected on account of this stock for 1919 was improperly exacted, and should be repaid."

In reviewing the case upon appeal the Circuit Court of Appeals said:

" * * * The Commissioner, in assessing the tax, proceeded on the theory that the $5 per share paid by appellee was a nominal price, that the stock was really transferred as compensation for personal services in organizing the new corporation, and that a taxable profit was derived from the transaction in the difference between the amount paid and the market value at the time of transfer. The District Court held against this contention and reached the conclusion that appellee in good faith had purchased the stock; that the $5 per share paid was a capital investment; and that no profit had been derived, as the stock had not been disposed of in any manner, or its increase in value realized. * * * We agree with the District Court that the transaction here in question was a purchase in good faith. In such case no taxable income would be derived until the disposal of the stock, except, of course, that arising from dividends. Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; McCaughn v. Ludington, 268 U. S. 106, 45 S. Ct. 423, 69 L. Ed. 868."

In the instant case substantially the same principle is involved. The plaintiff purchased shares of the corporation in 1928 in a perfectly legal procedure. The subsequent steps taken in January, 1929, resulted in an appreciation of the then market value of these shares. They were not, however, sold, it being the intention of the brothers to continue in the management of the business and to retain a substantial equity therein. If this interest is ultimately sold, the extent of gain then realized will for the first time represent a taxable profit in fact received.

The opinion of the District Court in holding for the defendant emphasizes the fact that after the transaction was completed the plaintiff had a profit from the sale of the preferred stock received and also "the increased value of the common stock held by him." This is, of course, true, but that increased value in the common stock existing on a given date was not translated into realized profit. It represented a value which accrued to the shares between the date of their issuance in 1928 and January 8, 1929. We

are left entirely in the dark as to what part, if any, of this enhanced market value accrued in 1928 because of the pendency and progress of the negotiations between the Eaton brothers, Hale, Waters & Co., and the corporation. We are left in the dark as to what part of this increased market value of the common shares accrued during the first week of 1929 due to the final consummation of the various transactions. We are mindful, too, that the enhancement in the value of the shares was commingled with the value which those shares had by virtue of the original payment to the corporation of $15,300. To undertake to segregate this accretion of value in and under the shares and treat it as taxable income for the year 1929, would not only involve guesswork and speculation but would lead to utter confusion in the application of tax legislation. The statute emphasizes that taxable gain is "the amount realized" in money received and fair market value of the property received. We know of no case that recognizes the enhancement of the market value of property already possessed as equivalent to the receipt of property with a market value. The plaintiff retained the same shares in 1929 as he acquired in 1928. They had a different value, but the same 1928 evidence of title. If we were to accept the accrual of value in shares already possessed as representing taxable income for the year 1929, why should we not inquire what was the value of the shares December 31, 1929? The only answer ventured is that January 8th, specified in the stipulation of facts, represents the most proximate date to the completion of the transactions but without evidence in the record to support the conclusion that the whole enhancement of value occurred on that date or during the seven preceding days of January.

These situations only emphasize the advisability and necessity of adhering to the well established rules and principles in dealing with legally established corporate entities and the status and character of corporate shares. To abandon these moorings, would create difficulties and uncertainties more objectionable in their results than any seeming inequities which would be eliminated or prevented.

The judgment of the District Court is reversed and the cause remanded to that court for further proceedings not inconsistent with this opinion; the appellant recovers costs of appeal.