CHARLES A. BENTLEY and EVA BENTLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bentley v. Commissioner
Docket No. 9315-75
United States Tax Court
T.C. Memo 1978-39; 1978 Tax Ct. Memo LEXIS 473; 37 T.C.M. (CCH) 211; T.C.M. (RIA) 780039; January 30, 1978, Filed *473 As payment for legal services petitioner transferred 10,000 shares of Portable Parking Structures International stock on March 10, 1970 and 10,000 shares on April 2, 1970. Petitioner valued the shares at $7.00 per share for deduction purposes while the recipient law firm valued the stock at $1.265 per share for income purposes. Held, the fair market value of such stock was $7.00 per share on the former date and $5.61 per share on the latter date. R. Michael Wilkinson, for the petitioners. Alan R. Herson and Marion Malone, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION *474 STERRETT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1970 in the amount of $16,948.21. Petitioners concede that an additional tax is due in the amount of $1,515.21. The remainder of the deficiency determined by respondent ($15,433) is the subject of this litigation. The sole issue before the Court is the fair market value of 20,000 shares of Portable Parking Structures International common stock transferred by petitioners in return for legal services for the purpose of calculating petitioners' section 162, I.R.C. 1954 deduction for those services. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Charles A. Bentley and Eva Bentley, husband and wife, resided in Beverly Hills, California at the time the petition herein was filed. Their joint Federal income tax return for the taxable year 1970 was filed with the western internal revenue service center, Ogden, Utah. A calendar year and the cash basis method of accounting were used to compute *475 their tax liability. Eva Bentley is a party to this action only because she joined in the filing of this return and, accordingly, Charles A. Bentley will hereinafter be referred to as petitioner. Petitioner formed Portable Parking Structures International (hereinafter PPSI), a California corporation in 1966. He was responsible for the creation and promotion of its principal product, a prefabricated modular parking structure that he had developed. PPSI owned the patent behind its product. The PPSI parking structures were constructed of steel and concrete, but could be dismounted and relocated. The erection and dismantling of these structures took a minimal amount of time. This structural concept generated a tremendous amount of interest on the part of the public and the industry. PPSI was written up in Time and Newsweek magazines, several trade journals, two Los Angeles newspapers and the AP International Wire Service. The initial shareholders of PPSI were petitioner, Daniel S. Malamed (hereinafter Malamed) and Joseph Paul Bregman (hereinafter Bregman). Malamed and Bregman obtained their shares in payment for legal services performed in conjunction with the formation *476 of PPSI. Their percentage of ownership in PPSI was 5 percent. In order to obtain needed working capital, PPSI issued additional blocks of stock in 1967 to the Norman Dreyfuss-William Godbey Group for an investment of $22,500 each and in June of 1968 to the Kliner, Bell & Company Group for an investment of $330,000 (for 330,000 shares). After these transactions petitioner no longer owned the controlling interest in PPSI. By 1970 PPSI had a complete organization including several individuals in charge of marketing. In order to obtain the capital needed to expand and hire personnel to exploit the market that interest in the structure had created, PPSI began negotiations directed towards a public offering of its stock. Initial contacts were made with several banking and investment firms including Morgan, Olmstead, Kennedy & Gardner; Lehman Brothers of New York; and Newburger, Loebs & Company. The latter company gave PPSI a commitment around January of 1970 to take the company public at the end of PPSI's fiscal year based on the contractual commitments for future work and the expected earnings thereon. In late 1969 or early 1970 an investigative team from Talley Industries Inc. *477 (hereinafter Talley) spent several weeks studying PPSI prior to its issuance of a tentative proposal for the acquisition of the corporation. This proposed offer could result in a down payment of $12,000,000, with a $24,000,000 earn-out based on PPSI's performance over the next 5 years. Calculated on a per share basis, this offer amounted to a down payment of $8.93 per share and a potential earnout of $26.80 per share. At this time PPSI stock had a par value of 10 cents per share ($134,333) and paid-in capital of $225,790 (16.8 cents per share) for a total stockholder's equity, exclusive of retained earnings, of $360,123 (26.8 cents per share). Retained earnings as of December 31, 1969 were $82,686 or 6.2 cents per share. By June 30, 1970 retained earnings had increased to $118,618 (8.8 cents per share). From its inception petitioner was president of PPSI and on the board of directors. Immediately after the Talley proposal was submitted to PPSI petitioner was called into a board meeting at which he was given the alternative of resigning or being taken to the District Attorney. Petitioner was being accused by a block of PPSI shareholders of questionable business practices. [1] *478 In early February of 1970 petitioner requested representation by the law office of Benjamin F. Schwartz (hereinafter Schwartz) and Leon S. Alschuler (hereinafter Alschuler). Petitioner desired their representation during the ensuing conflict. They had been recommended by Malamed who was at that time a member of the PPSI board of directors. Though petitioner's initial contacts were with Alschuler, his case was handled by Schwartz because Alschuler does not handle litigation. In early 1970 Schwartz's billing rate was $100 per hour. The Schwartz & Alschuler firm initially offered to represent petitioner for 10,000 shares of PPSI stock. However, after an investigation into the conflict they renegotiated the fee upward to 20,000 shares. Petitioner delivered 9,000 shares of PPSI stock to the law firm on February 27, 1970. The remaining 11,000 shares were delivered on March 20, 1970. The firm, for tax reasons, [2] *479 specified a split transfer date. Thus, 10,000 shares were transferred on March 10, 1970 and 10,000 shares were transferred on April 2, 1970. For the purpose of claiming a deduction for legal fees on his 1970 income tax return, petitioner valued the 20,000 shares of PPSI stock transferred to Schwartz & Alschuler at $7.00 per share. Respondent has determined that these shares should have been valued at $1.25 per share. The following sales of PPSI are on record during the calendar years 1969 and 1970: Number of
Price Date
Shares
Per Share
Seller
Buyer
11/69
500
$10.00
Petitioner
Boyko & Simmons
11/24/69
500
10.00
Petitioner
Acorn Painters
12/69
10,000
7.00
Bregman
Various [3]
3/70
1,000
7.00
Petitioner
Crosby
3/4/70
1,000
7.00
Petitioner
Imire
3/5/70
1,785
7.00
Petitioner
Boyko & Simmons
3/23/70
500
7.00
Malamed
Lipson
3/24/70
500
7.00
Malamed
Bernat
3/25/70
500
7.00
Malamed
Hasegawa
4/27/70
7,112
1.265
Brandt
Schwartz & Alschuler
5/1/70
5,000
2.50
Petitioner
11/15/70
10,000
2.50
Petitioner
12/9/70
248,950
1.15
Petitioner
12/15/70
1,000
2.50
Petitioner
*480 These buyers and sellers had the following relationship with PPSI: Individual or Firm
Relation with PPSI
Acorn Painters
None
Bernat
PPSI bookkeeper
Boyko & Simmons
Simmons on board of directors
as of 3/5/70. Petitioner's
personal friend and attorney
for petitioner, Dreyfuss
and Godbey.
Brandt
Unemployed stockbroker
Bregman
PPSI attorney of record
Crosby
Brother to Crosby, a
stockbroker.
Hasegawa
PPSI chief draftsman.
Imire
"Knew" petitioner.
Kayne
Partner in Newburger, Loebs
& Company, shareholder.
Krechman
Client and personal friend of
Bregman.
Lipson
PPSI salesman.
Malamed
Drafter of articles of
incorporation, member of
board of directors.
Rachman
Client and personal friend of
Bregman.
Schwartz & Alschuler
Attorneys for petitioner.
OPINION The sole issue before the Court is the fair market value of the 20,000 shares of Portable Parking Structures International common stock, transferred by petitioner in payment for legal services, for the purpose of establishing *481 the proper amount of his section 162 deduction. There is no question that the payment for such services was deductible. We cannot help but suspect that petitioner and Schwartz and Alschuler discussed, during their feesetting conversation, the value of the stock which was to be used as payment. Certainly such a conversation would be most understandable but unfortunately the record before the Court is so mixed on this point that we cannot comfortably fix a value based on our suspicions. Hence, we must turn to an independent analysis of the value of the PPSI stock. As can be seen from our table depicting the sales during 1969 and 1970 the crux to the valuation of the PPSI stock is the timing of the transfer of the 20,000 shares from petitioner to Schwartz & Alschuler. For tax purposes the timing of a transfer is determined by weighing the factors present in each case. Harmston v. Commissioner,61 T.C. 216 (1973), affd. per curiam 528 F.2d 55 (9th Cir. 1976); Commissioner v. Segall,114 F.2d 706 (6th Cir. 1940), cert. den. 313 U.S. 562 (1941). *482 The factor that has been given the most weight is the timing of passage of title. Other facts and circumstances to be considered are the time the transfer of possession occurred, Brunton v. Commissioner,42 F.2d 81 (9th Cir. 1930), cert. den. 282 U.S. 889 (1930), and whether conditions precedent have been substantially performed so that an unconditional duty to pay for the stock has arisen. Case v. Commissioner,103 F.2d 283 (9th Cir. 1939). Thus, when the benefits and burdens of ownership have passed to the new owner, Merrill v. Commissioner,40 T.C. 66 (1963), affd. per curiam 336 F. 2d 771 (9th Cir. 1964), or when the new owner has obtained dominion and control over the stock, Bankers Trust Co. v. United States,518 F.2d 1210 (Ct. Cl. 1975), cert. den. 424 U.S. 966 (1976), the transfer is complete. We have noted that petitioner entered into an agreement to transfer 20,000 shares of PPSI common stock to Schwartz & Alschuler in return for legal services. This agreement was confirmed by letter of February 17, 1970. Petitioner delivered 9,000 shares of PPSI stock *483 on February 27, 1970. The remaining 11,000 shares were delivered on March 10, 1970. All PPSI stock was subject to restrictions on its transfer; therefore, petitioner applied to the State of California, Department of Corporations for consent to transfer the stock on March 16, 1970. Consent was forthcoming on March 20, 1970. Petitioner's letter dated March 24, 1970 requested that PPSI transfer ownership of 10,000 shares from petitioner to "Schwartz & Alschuler, a partnership" prior to March 31, 1970. The transfer dates were set at Schwartz and Alschuler's behest in order to split their inclusion of income arising from this transfer into two taxable years. The parties stipulated that 10,000 shares of PPSI stock were transferred on March 10, 1970, with an additional 10,000 shares being transferred on April 2, 1970. Petitioner intimates that because the transfer of the second 10,000 shares was delayed for the benefit of Schwartz and Alschuler it would not be proper to affix the date of transfer of these shares for valuation purposes to the stipulated transfer date. We cannot agree. We have no evidence that the transaction was complete prior to the time of the transfer. Prior *484 to that time petitioner had delivered the stock and agreed to effectuate the transfer at a future time. We have no evidence before us that Schwartz and Alschuler had obtained dominion and control over the stock prior to the transfer. Schwartz had replaced petitioner on PPSI's board of directors but only as petitioner's representative. On March 5, 1970 Simmons in turn replaced Schwartz as petitioner's man on the board. Based upon these facts we find that passage of title occurred on the stipulated transfer dates. Therefore, the appropriate valuation dates are March 10, 1970 for the first 10,000 shares of PPSI stock transferred and April 2, 1970 for the remaining 10,000 shares. Use of March 10, 1970 and April 2, 1970 as the valuation dates and reference to the table of PPSI stock sales results in a fair market value of $7.00 per share for the stock transferred on the former date and $5.61 for that transferred on the latter date. [4]
However, respondent asserts that the transfers which reflect a price per share in excess of $1.25 should be disregarded. *485 He bases his assertion on his conclusion that these transfers are not representative of the fair market value of the stock. "Fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts." Jack Daniel Distillery v. United States,180 Ct. Cl. 308, 315-16, 379 F.2d 569, 574 (1967); Bankers Trust Co. v. United States,supra.Respondent contends that the parties involved in the transfer of PPSI stock were not reasonably informed with respect to the relevant facts. We do not agree.
Of the fourteen individuals or firms either purchasing or selling PPSI during the relevant period only one had no connection with the corporation or the parties involved therewith. Thus, there is nothing on record with respect to the Acorn Painters sale. The other parties involved had contacts with PPSI which ranged from "knowing" petitioner to being stockbrokers for firms which had dealings with PPSI. *486 The record contains letters addressed to petitioner relating to petitioner's sales to both Imire and Crosby (whose brother, a stockbroker having extensive contacts with PPSI, handled his investments) written in March of 1970 which disclosed that PPSI had suffered a management conflict resulting in petitioner's resignation, that the planned public offering of PPSI stock had been indeterminately delayed due to this management change and that such offering might be canceled, all of which could result in a reduction in the value of PPSI's stock. These letters also disclosed that the stock was restricted. Simmons, Hasegawa, Lipson, Bregman, Bernat and Malamed had direct dealings with PPSI. It is inconceivable that they had no notice of the resignation of petitioner. Simmons replaced Schwartz on the board of directors; Schwartz had replaced petitioner. Malamed was also on the board of directors. Hasegawa was PPSI's chief draftsman, Lipson a PPSI salesman, Bernat a bookkeeper and Bregman the PPSI attorney of record. Bregman sold PPSI stock to two individuals who were his clients and personal friends, Rachman and Krechman. Kayne was a partner in Newburger, Loebs & Company, the brokerage *487 house which had made a commitment to take PPSI public. Schwartz and Alschuler were representing petitioner in the conflict with the PPSI shareholders. Schwartz sat on the board of directors from the time of petitioner's resignation until March 5, 1970. Brandt was an unemployed stockbroker who had been employed by a now defunct firm, Kliner, Bell & Company which had been a substantial PPSI shareholder. We find these individuals to have been reasonably informed as to all relevant facts. Respondent further maintains that the values reflected in the March purchases are unreasonably high. However, * * * we cannot agree that, where a fair and ready market exists, the market price does not establish the value of the article. * * * "The actual value of property is what a purchaser in fair and free market conditions would have given for it in fact, not what a court at a later time may think a purchaser would have been wise to give." [W T. Grant Co. v. Duggan,94 F.2d 859 (2d Cir. 1938).] In contrast, petitioner contends that the Brandt sale in late April does not reflect *488 the fair market value, asserting that such sale was a distress sale, and cites Perlmutter v. Commissioner,T.C. Memo. 1967-19 in support of his position that this sale should be disregarded. However, he has not carried his burden of proof on this point. Welch v. Helvering,290 U.S. 111 (1933). Although it appears from the record that Brandt was unemployed at the time of the sale, it does not necessarily follow that he was destitute. We do not question petitioner's belief that the value of the PPSI stock at the time he agreed to pay Schwartz & Alschuler with stock was $7.00 per share. The firm of Boyko & Simmons agreed, as evidenced by its letter dated March 5, 1970, to represent petitioner on an hourly basis and to be paid with PPSI stock valued at $7.00 per share. Further, we do not consider it appropriate to question the reasonableness of a $140,000 fee for the representation petitioner expected to receive from that firm. [5] It appears that Schwartz & Alschuler considered the possibility of litigation to be very real. In November of 1970 Schwartz and Alschuler charged petitioner 10,000 shares of PPSI stock for representing petitioner in a *489 sale that was never consummated. At this time they valued the stock at $2.50 per share. In comparison a $140,000 fee for representing petitioner in the conflict with PPSI cannot be termed clearly excessive. The precipitous decline in the stock's value occurred, unfortunately for Schwartz and Alschuler, immediately following the transfer on April 2, 1970 of the second 10,000 shares to them. As stated we find the fair market value of PPSI stock to have been $7.00 per share as of March 10, 1970 and $5.61 as of April 2, 1970. Decision will be entered under Rule 155. Footnotes
1. From the record before us these allegations appear to have emanated from a power struggle between shareholders. Specificity as to these allegations can only malign petitioner's reputation. For our purposes we need only say that they were of a serious nature.↩
2. Schwartz & Alschuler's taxable year ended March 31, 1970.↩
3. Including: Hasegawa, Rachman, Krechman, Kayne and Lipson. Bregman had the opportunity to sell additional shares which he refused.↩
4. Calculated on a weighted average as follows: (i X $1.265) + (25 X $7.00). / 33 Section 20.2031-2, Estate Tax Regs.↩
5. The fact that Schwartz and Alschuler were concerned, at the time the amount of fee in stock was settled, about the tax consequences of receiving all 20,000 shares in one taxable year and therefore insisted that the shares be delivered in two taxable years lends credence to a belief that they thought the stock had a value considerably in excess of $1.26 per share.↩