Bruce Berckmans and Hildegarde Berckmans v. Commissioner.
Berckmans v. Commissioner
Docket No. 73967.
United States Tax Court
T.C. Memo 1961-100; 1961 Tax Ct. Memo LEXIS 255; 20 T.C.M. (CCH) 458; T.C.M. (RIA) 61100; March 31, 1961
*255 Petitioner subscribed for shares of new common stock of a corporation and paid $1 per share, the par value. At the time he purchased the stock, there was a plan whereby the corporation, which then had no assets, would purchase the assets of 2 corporations which had been engaged actively in the conduct of their respective businesses, provided the required capital could be obtained through obtaining loans and a large block of the new stock could be offered to the public through underwriting concerns and sold. As of the date of petitioner's purchase of the stock, there remained several contingencies and conditions the disposition of which had not been finally settled and concluded. Upon the facts, held, that the fair market value of the stock at the date of purchase was not more than its then book value of $1 per share. Richard E. Cross, Esq., and David N. Mills, Esq., for the petitioners. Robert B. Pierce, Esq., and Robert W. Siegel, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined an income tax deficiency for the taxable year 1955 in the amount of $261,878.01. The deficiency results from the determination of the respondent that the petitioner, Bruce Berckmans, realized income in the amount of $311,669.50, upon the acquisition in 1955 of 36,667 shares of new capital stock of a corporation, under section 61 of the 1954 Code. The question is whether upon the purchase of the stock for $1 per share, the petitioner realized ordinary income in an amount equal to the excess, if any, of the fair market value of the stock above the purchase price. Findings of Fact The petitioners *257 are residents of Detroit, Michigan. They filed a joint return for 1955 with the district director of internal revenue for the district of Michigan. Bruce Berckmans is referred to hereinafter as the petitioner. Berckmans has been engaged in the brewery business as an executive for over 20 years. During the period 1940-1950, he was vice president and general manager of Piel Bros. Brewery, and, later, executive vice president of Schaefer Brewing Company, both in Brooklyn, New York. During this period Berckmans' income from these positions was approximately $40,000 per year. On January 2, 1950, Berckmans became president and general manager of Frankenmuth Brewing Company, in Frankenmuth, Michigan. He continued to serve in this capacity, and as a director, until early in June 1955. During 1953-1955, he was employed under a long-term employment contract, expiring on December 31, 1961, at a salary of $50,000 per year. In addition, he received a bonus in the amount of $15,000 in 1953 and 1954. Frankenmuth was incorporated in Michigan in 1924 to succeed to a business established in 1899. Its brewery was located in Frankenmuth, Michigan, approximately 85 miles north of Detroit. The business *258 of Frankenmuth was the manufacture and sale of beer and ale. While Berckmans was the manager, Frankenmuth was able to pay a long-term debt of $1,272,000 with virtually no change in its working capital. Petitioner is a well qualified executive in the brewing industry and he is highly regarded in the industry. In 1952 petitioner advised the Frankenmuth directors that the future of a small local brewery such as Frankenmuth was not promising and that a program of expansion, mergers, or acquisitions would be necessary in the long run for the survival of Frankenmuth. The other directors agreed. Frankenmuth retained the services of J. A. Rainier, of New York City, in 1952, for purposes of looking for other breweries which might be acquired. On June 10, 1953, International Breweries, Inc. (International) was incorporated under Michigan law under the direction of Frankenmuth. Five thousand shares of $10 par value stock were authorized. Upon incorporation, 100 shares were subscribed for at their par value by Coughlin, Merrill, and Chandler, 3 attorneys of the law firm which represented Frankenmuth. However, the stock was not issued. The incorporation fee and costs of keeping International *259 in existence until early in 1955 were paid by Frankenmuth. When International was formed, Berckmans believed it might be a vehicle for future acquisition of or mergers with other concerns by Frankenmuth and, in any event, would serve to preserve the right to the future use of the name, International. For more than one year prior to June 1955, Frankenmuth had outstanding 750,000 shares of capital stock. The stock was listed and traded on the Detroit Stock Exchange. As of April 8, 1955, it had 910 stockholders. Berckmans owned 21,100 shares, slightly less than 3 percent of the outstanding stock. During 1952, 1953, and 1954, Rainier obtained information about breweries which might be purchased and gave it to Berckmans and Frankenmuth. Frankenmuth was not interested, however, in considering the purchase of the Globe Brewing Company in Baltimore, or the Tennessee Brewing Company in Memphis. Rainier continued his search for available brewery businesses until the summer of 1954, when such inquiries ended. During a period of about 2 years, from late in 1952 until the summer of 1954, Frankenmuth paid Rainier for his services. In 1953 and 1954 Berckmans also devoted time to making inquiries *260 about the possible acquisition of a brewery business, and a group of key employees of Frankenmuth inspected breweries and made samples of their products. Iroquois Beverage Corporation of Buffalo, New York, was organized in 1922 to succeed to a business established in 1892. It was engaged in the manufacture and distribution of beer and ale. It is referred to herein as Iroquois. From January 1, 1954, to June 3, 1955, all of the stock of Iroquois was owned by William W. Weigel and members of his family. Weigel owned 96 percent of the stock. In 1954 Edward Atwill, a son-in-law of Weigel, was the executive vice president, the general manager, and a stockholder of Iroquois. Berckmans and Atwill had been acquainted with each other since about 1943. In August 1954, at a brewery convention in New York, Berckmans had a discussion with Atwill about the possibility of the sale by Iroquois of all of its assets, or a merger of Iroquois with Frankenmuth. There was not any firm understanding about that possibility as late as September 1954. Early in their discussions it was made clear to Berckmans that Weigel was not interested in a merger with Frankenmuth or in any exchange of the assets *261 of Iroquois for stock, and that Weigel was interested only in selling the assets of Iroquois for cash. In the latter part of September 1954, Rainier introduced Berckmans to an investment banking concern in New York City, Shields & Co. There were discussions about the method of financing a possible merger of Iroquois with Frankenmuth which would involve both long-term loans from private lenders and the sale of an issue of stock through underwriters. An issuance of new stock would require registration of the stock with the Securities and Exchange Commission. Gene Catron of Shields participated in the discussion. Shields includes in its business activities the underwriting of common and preferred stocks and municipal bonds. It participates in negotiations relating to mergers and the investment of private and mutual funds, but it rarely provides funds itself for financing business undertakings. At a meeting of Frankenmuth's directors on October 12, 1954, Berckmans detailed the increasingly difficult problems facing small breweries and restated several alternatives which Frankenmuth might follow in order to meet competition. The management of Frankenmuth at this time advised Berckmans *262 of their desire to sell the business. The directors adopted a resolution authorizing and instructing Berckmans to seek a purchaser and negotiate a sale of the assets of Frankenmuth, provided, however, that the selling price would yield the shareholders not less than $4 per share. The directors' preference was to sell the assets and liquidate the corporation. Early in November 1954, Berckmans learned that there was a possibility of purchasing Iroquois. He reported this to Rainier; and at a meeting of the directors of Frankenmuth on November 18, 1954, he reported that he believed he had obtained a favorable basis for a consolidation with Iroquois. He reported, also, that in order to finance such arrangement it would be necessary to offer stock to the public and to obtain a commitment of an investment banking firm. Berckmans believed that the price of acquiring Iroquois would amount to about $6,500,000. Rainier, Berckmans, and Shields proceeded to work on the matter of obtaining capital through private loans and the public sale of stock of International for the purpose of International's purchase of the assets of both Frankenmuth and Iroquois. Rainier discussed with P. Stokes *263 Gaither, the president of New England Mutual Life Insurance Company, in Boston, the possibility of a loan of about 2 million dollars. Shields also participated in the discussions. In March 1955, Shields, in its office, prepared a memorandum on the subject of a public offering of stock of International which would be offered to the public at $10 per share. In this memorandum Shields contemplated purchasing 22,500 shares for $1 per share. In March 1955, Shields agreed upon a plan for financing the purchase of the assets of Frankenmuth and Iroquois through obtaining loans and selling stock of International through an underwriting group to be formed by Shields. It was expected that a block of 500,000 shares of new stock of International, having a par value of $1 per share, would be offered to the public. The steps to be taken were as follows: (1) Investigation of Frankenmuth and Iroquois in order that a report on the proposed new company and its financing could be prepared. (2) Informal conversations with Blue Sky Laws Commissioners in Michigan, Ohio, Illinois, Wisconsin, and Missouri to obtain clearance for the sale of stock in such states. (3) Informal conversations with prospective *264 members of an underwriting group to obtain a cross section of opinion as to the feasibility of making a public offering of International's stock. (4) Conversations with insurance companies with regard to obtaining a proposed loan. The indicated states in step 2 were the only states considered to be difficult states on Blue Sky laws at that time. Blue Sky laws were not a problem in the other states. Shields stated in a confidential memorandum dated April 4, 1955, prepared for prospective underwriters, that: Shields & Company expects to form an underwriting group to sell publicly for the new company 500,000 shares of $1 par common stock at a tentative offering price of $9.50 per share to net the company $8.50. * * *
This closing will be a simultaneous closing including the purchase of the assets and businesses of Frankenmuth and Iroquois from the proceeds derived from funds in hand, the placement of the insurance and bank loans and the sale of common stock. * * *
At $9.50 the stock will be offered at a price about 25% below the market price of other brewing equities and which will provide an attractive dividend return. It was agreed as of March 1, 1955, that Shields *265 and Berckmans would acquire 60,000 shares of International stock for which they would pay a total of $60,000 if the above four steps were taken to their mutual satisfaction. On March 14, 1955, the Frankenmuth attorneys applied to the Commissioner of Internal Revenue for a ruling as to the recognition for income tax purposes of the loss resulting from the proposed sale by Frankenmuth of all its assets to International. A favorable ruling was received by the attorneys from the Commissioner of Internal Revenue by letter dated April 29, 1955. The proposed method of financing the acquisitions by International, as contemplated in late March or early April of 1955, and as eventually materialized, involved the use in part of Iroquois' own excess cash, the borrowing by International from New England Mutual Life Insurance Company (New England Life) of $1,400,000 under a term loan, the borrowing by International from Manufacturers National Bank of Detroit (Manufacturers Bank) of $600,000 under a term loan and $250,000 under a revolving credit agreement, and the raising of $4,250,000 by the sale through an underwriting group (to be formed by Shields) of 500,000 shares of International stock *266 at a purchase price to the public of $9.50 a share, so as to net to International (after deducting the underwriters' discount) $8.50 a share. On April 13, 1955, Iroquois wrote a letter of intent to International indicating its willingness to urge its stockholders to agree to sell International all of the assets of Iroquois for cash in the amount of $6,000,000, subject to various conditions to be taken care of prior to May 15, 1955. On April 15, 1955, Frankenmuth wrote International a similar letter of intent indicating its willingness to urge its stockholders to agree to sell all of its assets to International for the net sum of $2,800,000, subject to certain contingencies. The 2 letters of intent were furnished at the request of Shields. On April 11, 1955, Berckmans, acting in his individual capacity and not as president of Frankenmuth, arranged for a change in the capital structure of International so as to increase its authorized capital stock to 600,000 shares of a par value of $1 per share. On April 15, 1955, the subscription rights covering the 100 shares initially subscribed for by the incorporators in 1953 were transferred to Berckmans and his wife as joint tenants *267 with the right of survivorship. On the same day Berckmans offered to subscribe for and purchase 36,667 shares of the capital stock of International (including the 100 shares) for $1 per share. On April 15, 1955, Shields offered to subscribe for 23,333 shares of the new stock of International for $1 per share. The total number of shares involved in the above offers was 60,000 shares. On April 15, 1955, at a meeting of the directors of International, a resolution was adopted accepting the above offers. On April 18, 1955, Berckmans received certificates for 36,667 shares of the capital stock of International, which were dated April 15, 1955. It was necessary for Berckmans to borrow money to cover the purchase. He obtained a bank loan on April 18, 1955, and he mailed his check to International for $36,667 on the same date. The check was received on April 19, 1955, by Richard F. Newton, counsel for International, who also had received Shields' check for $23,333, covering its stock purchase, before April 16, 1955. Newton kept Berckmans' and Shields' checks in his office vault until April 29, 1955, at which time he deposited them in International's bank account which was then opened. *268 The $60,000 so paid to International by Berckmans and Shields was for the purpose of providing funds for the estimated expenses of carrying out the contemplated transactions, including printing, legal, accounting, and engineering expenses, state and federal securities registration expenses, costs of brewery and other licenses, and other expenses. Such expenses eventually amounted to about $130,000. At a meeting of the board of directors held April 27, 1955, prior to the annual meeting of stockholders held the same day, the board of directors of Frankenmuth approved the sale of Frankenmuth's assets to International for $2,800,000, subject to approval of the stockholders by a vote of not less than a majority of all outstanding stock. On April 27, 1955, at Frankenmuth's annual meeting of stockholders, the stockholders approved the proposed sale to International, and on the same day the directors met and accepted International's purchase offer and authorized the execution and delivery of the purchase agreement. The purchase agreement between International and Frankenmuth is dated April 27, 1955, but actually it was not put in final form and it was not executed by Frankenmuth until *269 May 5, 1955. On May 6, 1955, the Iroquois stockholders approved the sale of the Iroquois assets to International. The formal purchase agreement between International and Iroquois is dated May 6, 1955, and it was executed by Iroquois on that date. The agreement provided that International's obligation was contingent, among other things, on International's obtaining the necessary funds for the purchase of assets from a public offering of its stock and the obtaining of loans; and it further provided that International could terminate the agreement if any labor union with which Iroquois had a collective bargaining agreement refused to consent to the assignment to International of the collective bargaining agreement, or refused to permit International to become a party thereto. The definitive terms of the purchase agreement between International and Iroquois were not finally negotiated until May 4, 1955. A Michigan statute in effect for many years prior to April 26, 1955, (Sec. 17 of Act 8 of the Public Acts of Extra Session of 1933 as amended by Act 281 of Public Acts of 1937, Act 174 of Public Acts of 1949, Act 219 of Public Acts of 1951, and Act 150 of Public Acts of 1952) provided *270 that no corporation could obtain a license to manufacture beer unless at least 25 percent of its stock was owned by citizens of Michigan. Legislation was introduced in the Michigan House of Representatives on February 11, 1955, to amend the law in such a way as to eliminate this requirement. However, the House of Representatives Liquor Control Committee amended the bill so as to reinstate the 25 percent requirement, and in the form in which the bill was passed by the House of Representatives on March 24, 1955, the 25 percent requirement was not eliminated or changed. The bill then went to the Senate, and passed the Senate on April 13, 1955, in a form which eliminated the 25 percent requirement. On April 15, 1955, the House of Representatives considered but did not concur in the Senate amendments. On the same date, the Senate requested a conference to attempt to reconcile differences. April 19, 1955, the House agreed to the Senate's request for a conference and appointed its representatives to the conference committee. The conference committee met and agreed on the Senate version of the bill (eliminating the 25 percent requirement), and in this form it passed both the House and the *271 Senate on April 20, 1955, and was signed by the Governor on April 26, 1955. Mich. Stat. Ann. Sec. 18.988 (Act No. 42 of the Public Acts of Michigan of 1955). The statute provided that it was to be effective immediately. Otherwise, under Michigan law it could not have become effective until 90 days after the end of the legislative session at which it was adopted. Mich. Constitution of 1908, Art. V Sec. 21. Prior to the change in the Michigan statute, Newton, as attorney for International, in March and April of 1955, discussed with the Michigan Liquor Control Commission the possibility of any waiver of the provisions of the statute or any method of circumventing the requirements of the statute, but was advised by the Commission that the statute must be complied with and could not be in any way circumvented. After the change in the Michigan statute, International received a Michigan brewery license, dated June 1, 1955. Berckmans understood that if the statute was not repealed or changed to eliminate the 25 percent stock ownership requirement, the proposed acquisition of Frankenmuth and Iroquois could not be accomplished because it would be difficult to guarantee that in the future *272 25 percent of the stock of International would be owned by citizens of Michigan. On about May 4, 1955, after all of the meetings with proposed underwriters, Shields completed the organization of its underwriting group, which consisted of 39 different underwriting houses, to handle the sale of 500,000 shares of International stock to the public. On May 12, 1955, a registration statement was first filed with the Securities and Exchange Commission. It was amended later by Amendment No. 1, dated May 25, 1955, and Amendment No. 2, dated May 31, 1955. The registration statement became effective on May 31, 1955, thereby enabling the underwriters to commence the sale of the stock. Shields, as representative of the underwriters, entered into a purchase agreement with International dated May 31, 1955. This was its first contract with International relative to the sale of stock. The execution of the agreement was approved by the directors of International on the same date. None of the members of the underwriting group, including Shields, were even conditionally committed in any way prior to the date of the contract. Underwriters never sign their commitment until just before the proposed *273 date of a public stock offering. This agreement provided that Shields' obligation was subject to a number of conditions and that it was under no obligation to proceed with the stock acquisition if any of the following circumstances should occur prior to the closing date of the proposed International stock offering: (a) If the registration statement were not accepted by the Securities and Exchange Commission by the closing date, or if proceedings for a stop order were pending or threatened on the closing date. (b) If Blue Sky law approval were not obtained from the Michigan Corporation & Securities Commission by the day after the effective date of the registration statement. (Blue Sky law approval was eventually obtained from about 25-30 states.) (c) If International on the closing date were not qualified to transact business as a foreign corporation in the State of New York. (d) If on the closing date the employment contract between Berckmans and International were not in full force and effect. (e) If on the closing date International did not receive the proceeds of the proposed New England Life and Manufacturers Bank loans (or equivalent loans from other sources) or did *274 not acquire all or substantially all the Frankenmuth and Iroquois assets. (f) If counsel's opinion disclosed, with respect to real property to be acquired, any title defects, encumbrances, easements or restrictions which were materially significant or which would materially interfere with the operation of International's proposed business operations. (g) If any substantial adverse change took place in the condition of Frankenmuth or Iroquois, financial or otherwise, after the date of the last balance sheet shown in the registration statement and prospectus and not referred to therein. (h) If Frankenmuth or Iroquois sustained any loss (insured or uninsured) prior to the closing date which would substantially adversely affect the conduct of the proposed business or operations or the financial condition or income of International. (i) If national or international affairs should be such as, or there should exist unfavorable market conditions for the successful sale of the International stock which, in the sole judgment of Shields, would render it impractical or inadvisable to consummate the sale of such stock as contemplated. (j) If International did not possess on the closing *275 date all state, federal and municipal licenses and permits (including New York and Michigan brewery licenses) required for the maintenance and operation of its properties and the business proposed to be conducted by International. (k) If any labor disturbances by the employees of Frankenmuth or Iroquois existed or were threatened at the time of closing which might substantially adversely affect the conduct of the proposed business, operations, financial condition or income of International. (l) If any legal action or suit were pending on the closing date or, to the knowledge of International, threatened against International, Frankenmuth or Iroquois (including proceedings before any commission, board or other administrative agency) wherein an unfavorable decision would materially affect the business, operations, financial condition or income of International. Shields regarded each of the conditions described above as vital and it would not have waived any of them or proceeded with the public stock offering if any one of such conditions had not been fulfilled. If an important condition had not been met, an endeavor would have been made to postpone the closing until it was met, *276 but a lengthy postponement would not have been possible with respect to this particular underwriting. Under the custom of the trade, underwriter groups are formed by expressions of interest to the managing underwriters by those underwriters who are invited to participate. This usually is done orally. Under the practice of the trade there is no formal legal commitment and there could be no formal legal commitment by a participating underwriter at the time the indication of interest is made because the Registration Statement has not been filed with the Securities and Exchange Commission at that time. The purchase contract between the offering company and the managing underwriter, as representative of the several participating underwriters, is normally signed on the same date the Registration Statement becomes effective. It is never signed until close to the offering date. In this case, the contract was dated May 31, 1955, and the Registration Statement became effective May 31, 1955. In the case of corporations whose stock is either not on the market or is not well known, participating underwriters are brought together by use of a confidential memorandum. This memorandum is sent to *277 prospective underwriters to advise them of the historical record of the company in order that they may make a commitment or "an indication"; additional information may be furnished to the prospective underwriter over the telephone by representatives of the managing underwriter and then the prospective underwriter, rather quickly in most cases, gives an "indication" of how much stock he wants. The practice of the trade is to make the indication as soon as the information is received. According to trade custom, the prospective underwriter is committed to the managing underwriters to participate in the offering once the indication is made. The offering of the new stock of International was oversubscribed. On May 7, 1955, Bercksmans and International entered into an employment agreement which provided that a salary of $50,000 per year would be paid to Berckmans for a term commencing with the date of closing and ending on December 31, 1960. This employment agreement was approved by the directors of International at their meeting of May 7, 1955, at which meeting the purchase agreements with Iroquois and Frankenmuth also were approved. Various resolutions were adopted relative to the *278 proposed qualification of International's stock under the Blue Sky laws of many states. There were separate resolutions for each of 10 different states. Also the officers of International were authorized to apply for the necessary Michigan and New York brewery licenses. On May 27, 1955, International and New England Life entered into a loan agreement covering a term loan of $1,400,000 by New England Life to International. On the same day, International entered into a $500,000 revolving credit agreement with Manufacturers National Bank of Detroit. No written agreement was ever entered into with the bank (prior to the closing of the term loan itself) with respect to the proposed term loan of $600,000. The acquisition of the Frankenmuth and Iroquois assets by International was consummated June 3, 1955, at which time International received all appropriate deeds, bills of sale, assignments, and related documents from Iroquois and Frankenmuth. On the same day, International received $4,250,000, the proceeds from the sale of 500,000 shares of International stock to the underwriters for $8.50 per share. Also, on June 3, 1955, International received $1,400,000, the New England Life term *279 loan; $600,000 from the Manufacturers National Bank term loan; and $250,000 under International's revolving credit agreement with the Manufacturers National Bank. On June 3, 1955, International paid Iroquois the sum of $6,000,000 for its assets; and it paid Frankenmuth the sum of $2,800,000 for its assets. At the same time, on June 3, 1955, Shields paid Rainier a cash finder's fee in the amount of $50,000. The petitioners still own 30,667 shares of International stock. Of the total number of shares acquired (36,667) they disposed of 6,000 shares late in May of 1955; 4,000 shares were sold to business associates, i.e., persons who became officers, directors, employees, or attorneys of International, at a selling price of $1 per share. They transferred 2,000 shares to relatives of Berckmans. The fair market value on April 15, 1955, and at all times up to April 30, 1955, of the stock of International was not more than $1 per share. Berckmans' purchase of 36,667 shares on April 15, 1955 was a bona fide and an arm's length purchase. Petitioner did not realize income in the amount of $311,669.50 upon the purchase of 36,667 shares of International stock in 1955. The respondent *280 determined that Berckmans realized, under section 61 of the 1954 Code, ordinary income in the amount of $311,669.50 upon the acquisition on April 15, 1955, of 36,667 shares of the new capital stock of International. In computing the above amount, he determined: that the stock had a fair market value of not less than $9.50 per share; that the total fair market value of the shares was $348,336.50; and that since petitioner had paid only $36,667 for the stock, income of $311,669.50 was realized by him in 1955. The stipulated facts are incorporated by this reference and are found as stipulated. Opinion The respondent determined that Berckmans acquired for $1 per share stock having a value at the date of purchase of $9.50 per share. Respondent's view now is that the fair market value of the stock was no more than $7 per share. The first question presented for decision is whether the fair market value per share of 36,667 shares of International stock on April 15, 1955, was $7 or $1 per share. Another question is whether the sale of shares of the stock to petitioners at $1 per share represented compensation for services of Berckmans, if the fair market value per share was more than *281 $1. The respondent contends that compensation was paid to Berckmans by means of an alleged bargain purchase of International's stock. Only if the stock had a fair market value at the date of purchase in excess $1of per share do we reach the question whether Berckmans received any compensation for services out of the transaction. Therefore, consideration is given first to the question of the fair market value of the stock on the date of purchase, April 15, 1955. That is the critical date. The burden is upon the petitioner to prove that the respondent's determination, as now modified by him, was in error. Fox River Paper Corporation, 165 F. 2d 639; Archer v. Commissioner, 227 F. 2d 270. Valuation is a question of fact. It is necessarily an approximation arrived at upon such factors as reasonably bear on determining the price which a willing purchaser would pay to an equally willing seller, without compulsion on either side and with knowledge of the material facts. *282 Anderson v. Commissioner, 250 F. 2d 242. The entire evidence, record, and contentions of the parties have been fully and carefully considered. The record includes the opinions of qualified witnesses about the fair market value of the stock in question at the critical time. Their opinions have been given consideration and the weight to which we deem them to be entitled, taking into account all of the facts and circumstances. We are not bound, however, to adopt the opinion of any expert witness in deciding the question. Helvering v. Safe Deposit & Trust Co. of Baltimore, 95 F. 2d 806; Helvering v. Maytag, 125 F. 2d 55. Rather, the question of value is to be decided upon the basis of the entire record. At the time petitioner purchased and paid for his stock, International was an inactive corporation, which might acquire going businesses or which might simply remain nothing but a shell. It had no business, no earnings, no management record, no experience and no assets, except $60,000 in cash which Berckmans and Shields paid for stock. In was incurring *283 liabilities for expenses, but nothing else. Immediately after the stock purchase, International had assets consisting solely of $60,000 cash, represented by 60,000 shares of stock having a par value of $1 a share, and possibly an even lower book value because of its accrual of legal, printing, engineering, and other expenses. International had no other assets, tangible or intangible; it did not have contracts with Frankenmuth, Iroquois, New England Life, Manufacturers Bank, or Shields and any members of the proposed underwriting group. As of April 15, 1955, neither Shields nor any other underwriter had executed or entered into any contract in connection with the purchase, underwriting and public offering of International stock; Shields had not completed the organization of an underwriting group. The stock had not been registered with the Securities and Exchange Commission or under any state Blue Sky laws and, therefore, it could not have been offered, legally, to the public at that time. Iroquois and Frankenmuth had given preliminary letters indicating their intent to recommend that their stockholders approve the proposed sale, but these letters stated that they were not intended *284 to be definitive and that written agreements had not been executed. Both proposed purchases were subject, on April 15, 1955, to numerous contingencies, including the ability of International to raise the necessary funds through institutional loans and a stock offering. In the case of Frankenmuth, the proposed sale of its assets also was contingent upon obtaining of an income tax ruling, and upon obtaining the approval of at least 80 percent of the stockholders. (Mich. Stat. Ann. Sec. 21.44; being Sec. 44 of the Michigan General Corporation Act.) Neither of the 2 lending institutions involved, New England Life and Manufacturers Bank, on April 15, 1955, had bound themselves in any way or given International even any preliminary letters of intent; and although they had internally approved the proposed loans by appropriate committee action (which, however, did not constitute contracts enforceable by the proposed borrower), even this internal approval was subject to all the other contingencies upon which consummation of the overall transaction depended, including the sale of the 500,000 shares of stock through the underwriters at a price of at least $8.50 per share net to International, *285 and the ability of International to acquire the assets of Frankenmuth and Iroquois under the terms as then contemplated. The proposed terms of the New England loan, as internally approved, were not satisfactory to International and later had to be changed. The first registration statement was not filed with the Securities and Exchange Commission until almost 4 weeks after the critical valuation date, April 15, 1955, and Shields and the underwriters did not enter into any contract with International until May 31, 1955, only 3 days before the closing of the purchase of the Frankenmuth and Iroquois assets. Even the underwriter's contract was subject to numerous contingencies and conditions. Thus, under the contract the ultimate consummation of the proposed acquisition of the Iroquois and Frankenmuth assets would have failed in the event of the occurrence of any of the following events: (1) The inability of International to obtain from the appropriate federal and state authorities all of the required licenses and permits to engage in the brewing business. (2) Failure to obtain acceptance by the Securities and Exchange Commission of the registration statement. (3) Failure to obtain Blue *286 Sky Law approval from the Securities and Exchange Commission of Michigan. (4) The occurrence, at any time prior to the closing, of any event which under the contract would have permitted Shields or any other underwriter to withdraw therefrom, such as the sustaining by Frankenmuth or Iroquois of any loss which would substantially and adversely affect the conduct of the proposed business or operations, or the occurrence of any national or international event resulting in market conditions which would be adverse to the successful sale of the stock to the public. The petitioner and the respondent differ in their respective views about the status on April 15, 1955, of several factors which had a bearing at that time on the fair market value of the stock of International. Briefly, the difference consists of the degree of optimism about the eventual outcome of various negotiations and plans which each party regards as possible and reasonable at the time of the critical date. Respondent's appraisal of the then status of the efforts of all concerned is more sanguine than that of the petitioner. The petitioner's view is that as of April 15, 1955, the then existing contingencies were substantial. *287 The respondent's view appears to be that there were few, if any, real contingencies. As there is no material dispute between the parties as to the factual nature of these contingent matters on April 15, our enumeration of the contingencies represents the common starting point from which the parties began their respective approaches to the valuation problem. The principal differences between the parties in their approaches to valuation, and their subsequent conclusions, are not in what remained to be done, but rather in divergent appraisals of the probabilities (on the critical date) that what remained to be done, would be done. In other words, the substantive disagreement is not one of fact, but one of prediction on April 15 as to the likelihood that the proposed combination of Frankenmuth and Iroquois into International would be accomplished. The petitioner's expert witnesses, Gilbreth and Parcells, both predicated their opinions upon the existence of the above described contingencies. Gilbreth is in the investment banking and securities underwriting business in Detroit, and Parcells is president of a corporation engaged in the same business. Parcells testified that it was *288 necessary that the contingencies be resolved favorably to International in order that the stock would have value. He testified that the stock was in no event worth more, on April 15, than its inherent value, and concluded that the fair market value of the stock was "something less than $1 per share." Gilbreth testified that because of the conditions of uncertainty with respect to the possibility of a public offering, and especially the unpredictability of the securities market at such time as a closing date might be reached, he would not arrive at a value higher than the amount paid for the stock on April 15, or the amount of net asset value on that date. It was Gilbreth's opinion that International's stock was worth no more than $1 per share on the critical date. Respondent's approach to the question differed in two material aspects from that of the petitioner. First, he contended that the valuation date should be extended to include the period from April 15 to April 29, when the petitioner's check in payment for the stock was deposited. We conclude that such contention is in error. The petitioner's offer to purchase the stock was accepted on April 15; the stock certificates *289 bore that date. We find that April 15 was the date of purchase and is the critical date for valuation. Second, the respondent's expert witness, Snyder (the executive vice-president of a corporation engaged in the business of underwriting and selling securities), testified that while he took into consideration some, but not all, of the contingencies considered by the petitioner's witnesses, he saw very little probability that any contingency would fail to be resolved in favor of International. Snyder conceded that his confidence of a successful outcome for the entire series of transactions, as of April 15, 1955, was largely based on Berckman's purchase of the stock and Shield's continued participation in the venture at that point. Snyder reasoned that unless the participants to the proposed public offering felt success assured, the attempt would have been discontinued before the critical date. In our opinion, Snyder's view was to a substantial extent influenced by what he regarded as the apparent hope of and confidence of the petitioner, Shields, and their associates in the outcome. Snyder testified that the stock of International had a value on April 15, 1955, of between $6 and $7 *290 per share. We find Snyder's opinion of value on the critical date too optimistic and not sufficiently realistic about the existing contingencies. It appears to be influenced by hindsight knowledge about the successful completion of a complex series of transactions. The respondent's position is neither novel nor without precedent. The facts here are to some extent similar to those in Trust Company of Georgia v. Rose, 25 F. 2d 997, affd., 28 F. 2d 767, and Eaton v. White, 70 F. 2d 449. In both of those cases sales of stock to private purchasers were very shortly followed by sales to the public at higher prices. In each case, the Commissioner determined the value of the stock sold just prior to a public offering to be the amount per share for which the respective shares were sold to the public. In each case, the courts refused to find that the public sale prices represented the values of the shares sold prior to the public offerings. It was said in Trust Company of Georgia, supra at page 999: The 13,677 shares in which it is supposed the trust company made a taxable gain, were bindingly contracted for on August 21, 1919, at *291 $5, * * * While it was believed on that day that the other stock could be disposed of at a price that would provide the balance of the cash necessary to buy the old company, and that thereby all of the stock would be made worth more than $5, or even $35, per share, nevertheless on that day the stock had no market value, and its future was wholly uncertain. We conclude that the facts in this case require a similar finding. The event giving value to the stock of International was the successful public offering of May 31, 1955. The offering itself was dependent, among other factors, on the virtually simultaneous completion of loans to International from a bank and an insurance company, the sales to International of the assets of Iroquois and Frankenmuth, and the purchase by the underwriting group of 500,000 shares of International for $8.50 per share. The completion of each of these transactions was interrelated. All of these transactions were conditioned upon the successful resolution of numerous contingencies, including the survival of certain of the principals, the passage of a bill before the Michigan legislature, the receipt of a favorable revenue ruling, the availability of a *292 corporate name, issuance of a registration statement by the Securities and Exchange Commission, and the existence of favorable market conditions. An adverse development in any one of these situations very likely would have proved fatal to the entire operation. No contractual commitments were in existence on April 15, 1955, whereunder any of the participants, including the lenders, the underwriters, and the stockholders of Iroquois and Frankenmuth, were in any way committed to proceed with their undertakings. The entire series of transactions continued to stand in a precarious and delicate balance until at least May 31, 1955. Upon careful consideration of all the evidence and the factors discussed above, it is held that on April 15, 1955, and at all times prior to April 30, 1955, the value of the stock of International did not exceed $1 per share. The conclusion reached disposes of the issue. Because of other uncontested adjustments, there is a deficiency, the amount of which will be computed under Rule 50. Decision will be entered under Rule 50.