HELVERING, Commissioner of Internal Revenue, v. NIBLEY—MIMNAUGH LUMBER CO.

No. 6037.

Court of Appeals of the District of Columbia.

Argued Feb. 13, 1934.

Decided March 19, 1934.

Rehearing Denied May 7, 1934.

Sewall Key, John G. Remey, E. Barrett Prettyman, Shelby S. Faulkner, and Chester A. Gwinn, all of Washington, D. C., for petitioner.

Stanley Suydam and H. Prescott Gatley, both of Washington, D. C., for respondent.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Respondent was a corporation organized under the laws of Oregon and engaged in the lumber business. Some time prior to August 1, 1923, it had negotiated with Bowman-Hicks Lumber Company for the purpose of effecting a sale of its plant, timber lands, and personal property. On the date mentioned, respondent's board of directors, with the approval of more than two-thirds of its stockholders, passed a resolution authorizing its president and secretary to convey title to all of its assets to J. F. Ravenscroft as liquidating trustee, but this conveyance was never actually made. However, on the following day, a contract was made by Ravenscroft, as liquidating trustee—in which respondent joined as grantor—with Bowman-Hicks Lumber Company, in which it was recited that the "seller has contracted to sell and the purchaser has contracted to buy" all of respondent's property, real and personal, except accounts receivable and cash. The contract provided that the purchase price should be $1,150,000, of which $100,000 was to be paid at once in cash, $350,000 more upon ratification of the contract by respondent's stockholders, and the balance to be evidenced by five negotiable promissory notes of equal amount dated August 3, 1923, made by the buyer and bearing interest at the rate of 5½ per cent. per annum, maturing at one-year intervals thereafter, and secured by a purchase-money mortgage given by the buyer to the seller. The seller agreed to furnish abstracts of title to all tracts, and, in the event the title to any part proved unsatisfactory to the purchaser or could not be cured, then and in that case there was to be a pro tanto reduction of the purchase price based upon the amount of timber on the land and the number of acres within the tract. There was a further condition that, if there should prove to be a smaller quantity of lumber on hand at the mill than was estimated in the contract, there should be in like manner a reduction in the purchase price. These reductions, if any, were to be applied against the principal of the notes to be executed and delivered simultaneously with the delivery of the deed. The contract also provided that, in the event the purchaser should refuse to perform after the seller had complied with all conditions, the seller should have the right to terminate the contract, re-enter and take possession of the property, including any improvements made by the purchaser, and to retain the cash payments as liquidated damages. If the title to the site on which the mill stood should prove incurably defective, or if the area of merchantable timber should prove less than 20,000 acres, the purchaser might refuse to carry out the contract, in which event the purchaser's advances and expenditures were to be counted as a loan to the seller at 8 per cent. interest, secured by a first lien on the property. Provision was also made for the ratification of the contract by the stockholders not later than August 10, 1923.

On the day the contract was executed, delivery of possession of the mill and of the timber holdings was duly made to the buyer,

and on August 11, 1923, respondent's stockholders approved and ratified the contract. $100,000 was paid the day the property was delivered, and $350,000 two weeks later. After taking possession, the buyer continued for its own account to carry on the lumber operations, and between the date of delivery and the end of 1923 had cut, manufactured, and delivered some 12,000,000 feet of timber, rebuilt a large part of the railroad running through the holdings, and generally exercised all the rights of ownership and dominion. By December 18, 1923, Ravenscroft, who received the cash purchase money as liquidating trustee, had distributed directly to respondent's stockholders substantially the whole amount paid by the buyer, and also before the end of the year 1923 abstracts of title covering more than 21,000 acres of respondent's lands, including the mill site, had been duly tendered and accepted. The findings by the Board show that the parties were able to determine the amount of manufactured timber in the yard within a few days of delivery of possession, but the amount of standing timber was not finally determined until early in 1924, and on January 15 of that year it was agreed between the parties that $66,508.07 of the stated sales price should be remitted to the buyer to be deducted from the notes representing the balance of the purchase price, and on February 28, 1924, a deed of conveyance covering the mill and certain described timber lands, being all of the assets of the respondent, was executed, the preamble of which reads:

"This indenture made as of the 3rd day of August 1923, but actually executed this 28th day of February 1924, between J. F. Ravenscroft, as liquidating trustee, * * * Witnesseth."

And simultaneously with the execution of the deed of bargain and sale, the buyer executed a deed of trust to secure the deferred payment notes in the amount of $633,500 representing the balance due. The notes were dated August 3, 1923, and bore interest from that date, though delivery was not had until February 28, 1924, when the title deeds were executed and delivered. In March, 1924, respondent was duly dissolved as a corporation under the applicable Oregon statutes. Respondent filed an income tax return for the year 1923 covering the period up to August 3, and Ravenscroft filed a return for himself as trustee for the period August 3 to December 31, 1923, and also for 1924. Respondent filed no return in 1924, and did not report the profit from the sale in its return for 1923. Neither respondent nor the liquidating trustee paid any tax on account of the sale, and there is no finding as to whether the stockholders individually did or did not pay a tax on their individual profits arising out of the transaction.

There is no doubt the profit derived from the sale was taxable income to the seller. The Commissioner insists that the tax was due in 1924. The Board of Tax Appeals held it was due in 1923. The single question, therefore, for decision is whether the profit was derived in 1923, when the contract of sale was executed and possession delivered, or in 1924, when the contract was completed by delivery of the deed and acceptance of the notes. The question is important here because of the statute of limitations.

The position of the Commissioner is that in 1923 the seller received cash and a contract, and that it failed to report either, and hence failed to establish that the contract had a fair market value. He says that the sale is what is denominated in the income tax regulations a deferred payment sale, and that the applicable principle in such a case is embodied in article 46 of Regulations 62, which provides in substance that where the obligations of the purchaser have no readily realizable market value, the amount of the initial payment should be applied against and reduce the cost of the property sold, and gain or profit thereafter arises only when the amount realized upon the obligations exceeds the cost thus reduced. The Board, on the other hand, held that the intent of the parties, together with the admitted facts of possession and dominion in 1923, established a transfer for income tax purposes in that year. The argument on behalf of the respondent in this court is that the Board was right because the sale was made in 1923 and, on respondent's theory, closed in 1923. This, respondent claims, is shown by the fact that all the conditions of the contract to be performed by the seller were complied with in 1923; so it says that upon execution of the contract and delivery of possession the vendee became the absolute owner of the land, and this it claims is the test.

Admitting all that is claimed by respondent as true, it is not decisive of the case. The applicable statute is 213 (a) of the Revenue Act of 1924 (26 USCA § 954 (a), which provides that the term "gross income" includes "gains, profits, and income derived from * * * sales, or dealings in property." As we have already said, the sale produced income. The question is the year

it should be taxed. Epitomized, the facts show that in August, 1923, the buyer and seller agreed on the purchase price of the property. More than 35 per cent. of the agreed price was then and there paid, and a contract of sale executed. In it the seller agreed that the timber acreage transferred would amount to at least 20,000 acres and that the title would be satisfactory. Both these conditions were met in 1923, but there was another condition which provided a proportionate reduction in the purchase price in the event the manufactured lumber and standing timber should be less than the quantity agreed to be delivered. The determination of this question was postponed until 1924, and on January 15 of that year the amount of abatement of purchase price was agreed on, and in February the title deed, the mortgage, and the secured notes were executed and delivered. In the circumstances we have detailed, we think the answer to the question depends not wholly, as respondent insists, on the determination whether the sale in 1923 was a completed sale, but here also on the determination whether the seller at the time of the sale was on a cash or an accrual basis. If it was on an accrual basis, the facts shown are sufficient to accrue the entire purchase price in 1923, and that too without regard to the fact that the agreed price was conditionally subject to abatement. This is true, we think, because it amply appears that in 1923, in addition to the delivery of the property, the seller had otherwise complied with his contract, as the result of which there existed an unconditional obligation on the buyer to comply. But a different situation exists and a different principle is applicable if the seller was on a cash basis, for it is unquestioned that the consideration (over and above the cost of the property to the seller) was not *received* until 1924.

The rules of the Treasury Department (Regulations 45, art. 22, Act of 1921; Regulations 65, art. 22, Act of 1924) provided that the "time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such a manner as clearly reflects the taxpayer's income." And article 50 provides that gains, profits, and income are to be included "in the gross income for the taxable year in which they are received by the taxpayer, unless they are included when they accrue to him in accordance with the approved method of accounting followed by him."

The sum of these regulations is that the time when taxable income shall be due is to be determined by the method of accounting adopted by the taxpayer, and, if the accrual method is not adopted, then the profits are to be included for the taxable year in which they are *received*. In view of the stated facts in this case, it is clear, we think, that the seller received in 1923 a large amount of cash and a contract under which it could demand the execution and delivery of mortgage notes for the balance of the purchase price, but it is not and cannot be contended that the contract itself had a readily realizable market value, or that the seller ever claimed it had by reporting it when received. We think it is a mistake to say that the contract was a part of the consideration for the transfer of the property. It was an evidence of the mutual rights and obligations of the parties in the sale, but it had value in itself only as it fixed the rights and obligations of the parties. One of these rights appertaining to the seller was that it was entitled to receive, at a certain time, payment in notes of the balance of the purchase price. The right to have these notes accrued in 1923, because it was a fixed liability then, but the delivery was postponed to the following year. It was therefore not until 1924 that the notes were either actually or constructively received, and, if the time of receipt is the test of tax liability, and on the cash basis we think it is, it is perfectly simple that that year rather than the previous year was the correct date for their return for taxation.

In this view, we have searched the record to ascertain whether respondent was on the cash or accrual basis, and we find nothing to answer this query. In the circumstances, we think it fair to all parties to remand the case to the Board with instructions to set aside the order appealed from and to rehear the matter on the single question whether respondent was on the cash or accrual basis. If the Board shall find it was on the accrual basis, the order heretofore entered shall be reinstated; if it shall determine respondent was on the cash basis, a final order in favor of the Commissioner shall then be entered.

Remanded.