Edwin M. Dezendorf and Florence L. Dezendorf v. Commissioner.
Dezendorf v. Commissioner
Docket No. 66283.
United States Tax Court
T.C. Memo 1961-280; 1961 Tax Ct. Memo LEXIS 66; 20 T.C.M. (CCH) 1480; T.C.M. (RIA) 61280; October 9, 1961
*66 David L. Tisinger, Esq., 1210 Capital Nat'l Bank Bldg., Austin, Tex., for the petitioners. Harold L. Cook, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners and additions to tax for the indicated years as follows: Additions to tax I.R.C. 1939
Year
Deficiency
Sec. 294
Sec. 294
(d)(1)(A)
(d)(2)
1952
$9,617.54
$1,514.16
$1,009.44
1953
7,814.94
799.70
468.90
Issues presented by the pleadings are the correctness of the respondent's action (1) in disallowing a deduction of $15,128 taken for 1952 as a loss on abandonment of quarries, (2) in disallowing $2,259.45 of a deduction taken for 1952 for depreciation, (3) in disallowing a deduction of $1,300 taken from gross rents for 1953 as depreciation of an automobile, (4) in increasing the taxable income of the petitioners for 1953 by $33,949.08 as representing their income from Dezendorf Marble Company for that year, (5) in reducing the taxable income of the petitioners for 1953 by the amount of $19,200 which they reported as interest received during that year *67 from Dezendorf Marble Company, (6) in determining an addition to tax for 1952 under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for failure to file a declaration of estimated tax, (7) in determining an addition to tax for 1953 under section 294(d)(1)(A) for failure to file a timely declaration of estimated tax, and (8) in determining additions to tax for 1952 and 1953 under section 294(d)(2) for substantial underestimation of tax. General Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners, Edwin M. Dezendorf, also known as E. M. Dezendorf, sometimes hereinafter referred to as the petitioner, and Florence L. Dezendorf, are husband and wife residing in Austin, Travis County, Texas. They kept their books and prepared their income tax returns on a calendar year basis. They filed their joint Federal income tax returns for 1952 and 1953 with the director in Austin, Texas. Samuel C. Bilbrough, sometimes hereinafter referred to as Bilbrough, and Irene D. Bilbrough are husband and wife and are son-in-law and daughter of petitioners. They were married in 1929, reside in Austin, Texas, and filed their joint Federal income tax *68 return for 1953 with the director in that city. For many years prior to the taxable years involved herein the petitioner owned and operated a sole proprietorship d.b.a. Dezendorf Marble Company with his principal office and place of business in Austin, Texas. The proprietorship was engaged in the business of manufacturing and selling terrazzo marble chips and marble, feldspar, and dolomite chips for terrazzo flooring and for roofing, and in the business of leasing lands for mining and preparing for sale and selling various colors of marble and granite prepared in aggregate or chip form. The proprietorship had acquired by lease or purchase various lands, buildings, machinery, and improvements necessary or useful in the operation of the business. Bilbrough entered the employment of the proprietorship in November 1942 and continued in its employment until entering the Army sometime in 1943. After returning from the Army he entered the employment of the proprietorship about June 1946 as manager. By the first of 1947 he was in complete charge of operating the proprietorship and thereafter continued so. In January 1950, the petitioner was injured in an automobile accident and thereafter, *69 in that year, Bilbrough, as manager of the proprietorship, was given authority to borrow money for the operation of the proprietorship business. Issue 1. Loss on Abandonment of Quarries Findings of Fact In Schedule C of their income tax return for 1952 the petitioners took a deduction of $15,128 for "Other business expenses" which they explained merely as "Marble Quarries now Exhausted & abandoned" without further explanation or description. In determining the deficiency here involved for 1952 the respondent disallowed the deduction on the ground that petitioners had failed to show that the quarries were in fact abandoned in 1952 or, if there were an abandonment, that any loss was sustained with respect thereto. The quarries with respect to which the above-mentioned deduction was taken were the Western Electric Quarry at Bluffton, Texas, the Scholte Quarry near Llano, Texas, Rausch Ranch Quarry in Gillespie County, Texas, the Rickerson Ranch Quarry near Llano, Texas, and the Black Quarry in Marble Falls, Texas. The land on which all of the foregoing quarries were operated was held by petitioner under lease except the Black Quarry which was operated on land owned by petitioner. *70 The Black Quarry was opened by petitioner about 1940 or 1941, but petitioner does not know whether he discontinued removal of mineral from the quarry in 1952 or in 1950 or 1951. The land on which the quarry was operated was transferred to Bilbrough subsequent to 1952 in a sale to him by petitioner of the Dezendorf Marble Company business and the assets used therein and connected therewith. Thereafter Bilbrough, employing the assets so acquired, conducted the same kind of business as petitioner had conducted. The petitioner acquired the lease on the land on which the Western Electric Quarry was situated in 1945. At the time petitioner acquired the lease there was a lake near the land. Because of water in the quarry the petitioner never removed any mineral from the Western Electric Quarry. However, the petitioner removed minerals from each of the other above-mentioned quarries, took the minerals to Austin, Texas, and crushed them. The petitioner does not know when he obtained the leases on the land on which the Scholte, Rausch Ranch, and Rickerson Ranch quarries were operated nor does he know when he abandoned or disposed of the lease on the land on which the Rickerson Ranch Quarry *71 was operated. The leases on the lands on which the Scholte and Rausch Ranch quarries were operated were abandoned or disposed of by petitioner in 1950. The lease on the land on which the Western Electric Quarry was situated was abandoned in 1950 or 1951. The petitioner does not have any records as to the costs he may have incurred in 1952 and prior years in acquiring or developing any of the above-mentioned mining leases or in developing the Black Quarry on land which he owned. Nor does the record disclose whether the costs the petitioner may have incurred were capitalized and recovered by way of depletion allowances or were currently deducted as business operating expenses. Opinion Losses resulting from abandonment are sustained during the year of abandoned and, if deductible at all, are deductible for the taxable year in which the abandonment occurs. Ordinarily there must be an intention to abandon, evidenced by some act, and such intention and act are to be ascertained from the facts and surrounding circumstances. Non-use alone is not sufficient. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co., 34 B.T.A. 177 (1936), and W. B. Davis & Son, Inc., 5 T.C. 1195 (1945). *72 It has been held, however, that an act of abandonment alone is sufficient. Mine Hill and Schuylkill Haven R. Co. v. Smith, 184 F. 2d 422 (C.A. 3, 1950), certiorari denied 340 U.S. 932 (1951). From a consideration of the situation here presented in the light of the foregoing we are unable to find that any of the quarries here involved were abandoned during 1952, the year for which the deduction for abandonment was taken. While petitioner testified that he did not know whether he discontinued removal of mineral from the Black Quarry in 1952 or in 1950 or 1951, the record shows that petitioner sold the land on which the quarry was operated to Bilbrough in a year subsequent to 1952 and indicates that Bilbrough thereafter used it in the conduct of the same kind of business as petitioner conducted as a sole proprietorship. If it be conceded that petitioner ceased removal of mineral from the quarry in either of the years 1950, 1951, or 1952, the petitioner would not be aided since non-use alone is not sufficient to establish abandonment. As to the other quarries the evidence shows that petitioner either did not know the year in which the leases involved were disposed *73 of or abandoned or that the leases were disposed of or abandoned in some year other than 1952. Further, if we were able to find that all or any of the quarries in question were abandoned in 1952, we would be unable to determine that the petitioner thereby sustained any deductible loss because of the lack of evidence as to petitioner's cost or other basis of the quarries and his subsequent treatment of such cost. On the record presented we sustain the respondent's action as to this issue. Issue 2. Deduction for Depreciation Findings of Fact In Schedule C of their income tax return for 1952 the petitioners took a deduction of $16,053.70 for depreciation of the various depreciable assets used in the petitioner's sole proprietorship business. In determining the deficiency for 1952 the respondent determined that depreciation in the amount of only $13,794.25 was properly deductible and disallowed $2,259.45 of the deduction taken on the ground that the petitioners did not take into consideration salvage value of the assets in computing the deduction taken. The depreciation deduction taken in the return of the petitioners was computed on a straight line method by which the cost *74 of the respective assets was divided by the estimated number of years of the life of the respective assets and the quotient was used as the amount of depreciation per taxable year. The computation of depreciation by such a method did not give any effect to any salvage value that any asset might have at the end of the estimated life thereof. Opinion The petitioner testified that he did not know how the depreciation schedule of his return was prepared. However, Bilbrough who stated that he prepared the schedule also stated that he thought he took salvage value into account in preparing the schedule by reducing the cost of the respective assets by the amount of estimated salvage of the respective assets at the end of the estimated life thereof. A comparison of the stipulated cost of the respective assets with the cost thereof shown in the depreciation schedule shows that was not done. Since we are unable to find from the record that the assets in question will be completely worn out or valueless at the end of their estimated lives and will have no salvage value, we are of the opinion that consideration must be given to salvage value in determining allowable deprecation. Massey Motors, Inc. v. United States, 364 U.S. 92 (1960); *75 Cohn v. United States, 259 F. 2d 371 (C.A. 6, 1958); Regulations 118, sec. 39.23(1)-1. Inasmuch as the record fails to show error in the respondent's determination that depreciation in the amount of only $13,794.25 was properly deductible for 1952 when consideration is given to the salvage value of the assets in question, the respondent's determination is sustained. Issue 3. Disallowance of Deduction Taken From Gross Rents for 1953 for Depreciation of an Automobile. In his reply brief the petitioner concedes the correctness of the respondent's action as to this issue. Issue 4. Increasing Taxable Income of Petitioners for 1953 by $33,949.08 as Representing Their Income From Dezendorf Marble Company. Issue 5. Reducing Taxable Income of Petitioners for 1953 by $19,200 Which They Reported as Interest Received During That Year From Dezendorf Marble Company. Findings of Fact In November 1952, Bilbrough became dissatisfied with the salary he was receiving for his services as manager of the Dezendorf Marble Company, the petitioner's sole proprietorship, and the fact that he had not received an interest in the business, which he felt he was entitled to. As a result *76 of a disagreement between Bilbrough and the petitioner, the petitioner submitted to Bilbrough two written instruments, one being a proposed agreement for the sale of the business and assets to Bilbrough and the other being a proposed agreement for the continuation of Bilbrough's services as manager of the business. Neither of the instruments was executed since neither of the proposed agreements was acceptable to Bilbrough. Subsequently Bilbrough and the petitioner further discussed the situation. Bilbrough was concerned about the amount of the down payment that petitioner would require in the event of the sale of the business and, being unable to make a down payment of any specified amount, informed the petitioner to that effect. The discussion resulted in petitioner in December 1952 proposing to sell the business to Bilbrough stating with respect to such proposed sale "that he would make an agreement of some kind that would be satisfactory" to Bilbrough. At that time it was agreed that Bilbrough would continue in charge of operating the business during 1953 and after the end of that year he could make a down payment toward the purchase price of the business of such amount as he then *77 would be able to make. Also, at or about that time the petitioner paid Bilbrough a bonus of $1,500 for his services during 1952. During 1953 Bilbrough continued in charge of operating the business and drew a salary on which income tax and social security tax were withheld by the Marble Company. During that year the petitioner made cash withdrawals from the business totaling $35,000. On some occasions the withdrawals desired by petitioner were, upon petitioner's request, handed to him by Bilbrough and on other occasions the amounts desired by petitioner were merely taken by petitioner without request being made on Bilbrough. The withdrawals were used by the petitioner to pay personal expenses and to make investments in corporate stock. During 1953 no notice was given the insurance companies which wrote business insurance for the Marble Company that the business had been sold to the Bilbroughs. Nor were titles to the business vehicles of the company changed to reflect a sale of the business to the Bilbroughs. During 1953 no instruments were signed by the petitioners and the Bilbroughs reflecting a sale of the Marble Company. Because of "the squabble going on and changing this and *78 that" an agreement for the sale of the Marble Company business and assets acceptable to Bilbrough and his wife was not reached by Bilbrough and petitioner until January 4, 1954. Thereafter, on January 15, 1954, the petitioner sold to the Bilbroughs the Marble Company business and assets used therein and connected therewith for $320,000. On the same day the petitioners and the Bilbroughs executed a bill of sale and a mortgage agreement respecting the company's business and assets used therein and connected therewith. The mortgage agreement contained the following provisions, among others: 1. This agreement shall be effective as of January 1, 1953, and all transactions herein referred to shall, for all legal purposes, be treated as though they occurred January 1, 1953. 2. Mortgagors [Bilbroughs] have purchased from mortgagees [petitioners], the Dezendorf Marble Company, and the assets thereof, and connected therewith, more particularly described on Exhibit "A" attached hereto and made a part hereof. 3. As part of the consideration of such purchase, mortgagors agree to pay to mortgagees the sum of Three Hundred Thousand & No/100 ($300,000.00) Dollars on January 1, 1973, with *79 interest at six (6%) per annum from January 1, 1953, such interest being payable in monthly installments beginning January 31, 1953, and continuing on the last day of each calendar month thereafter, such interest to be calculated on the unpaid principal balance on each monthly payment date. * * *
5. Mortgagees hereby acknowledge receipt of all interest for the year 1953, and hereby further acknowledge receipt of an additional Twenty Thousand & No/100 ($20,000.00) Dollars (paid in part with cash and in part with securities); such Twenty Thousand & No/100 ($20,000.00) Dollars being the only other consideration for the purchase besides the Three Hundred Thousand & No/100 ($300,000.00) Dollar obligation hereinabove mentioned, it being expressly agreed and understood that the total purchase price was and is Three Hundred and Twenty Thousand & No/100 ($320,000.00) Dollars. In other words, from and after the date of execution hereof, mortgagors shall not be obligated to mortgagees except to pay Three Hundred Thousand & No/100 ($300,000.00) Dollars plus interest, as above stated, and otherwise to keep and perform the covenants set forth in this instrument. 6. It is expressly agreed *80 and understood that all profits for the year 1953 of the Dezendorf Marble Company are the property of mortgagors, and that both legal and equitable title to the said Dezendorf Marble Company and all property described on the attached Exhibit "A" shall be deemed to have passed to and vested in mortgagors January 1, 1953. 7. Mortgagors covenant that until one-half (1/2) of the principal indebtedness is paid, that the name Dezendorf Marble Company shall not be changed, but it is expressly agreed and understood that mortgagors shall file the required assumed name certificate with the County Clerk showing that Dezendorf Marble Company is owned by mortgagors. * * *
9. It is expressly agreed and understood that mortgagees shall have the option of foreclosing the lien herein granted, however in the event that mortgagors should sell the business to any person, firm or corporation not approved of in writing by mortgagees, or either of the mortgagees. 10. Contemporaneous with the execution hereof, mortgagees have executed appropriate warranty deeds and an appropriate bill of sale covering the properties involved, and mortgagors have executed an appropriate assumed name certificate. *81 This instrument and such deeds, bill of sale and assumed name certificate, constitute all of the writings documenting the agreement of the parties, and no other understanding or agreement except that shown in the writings shall be enforceable. * * *
The eight tracts of real estate which constituted part of the assets involved in the sale were transferred by petitioners to the Bilbroughs by warranty deeds executed by petitioners on January 15, 1954. On or about January 4, 1954, Bilbrough borrowed some money from a bank which he paid to petitioners as part of the down payment of $20,000 referred to in paragraph 5 of the mortgage agreement. On January 19, 1954, the petitioners filed with the County Court of Travis County, Texas, a Withdrawal of Assumed Name Certificate with respect to the Marble Company which revoked an Assumed Name Certificate filed by petitioner on January 13, 1934. On January 19, 1954, Bilbrough and his wife filed with the County Court of Travis County, Texas, an Assumed Name Certificate for the Marble Company. On October 16, 1946, the petitioner filed with the Austin National Bank, Austin, Texas, a signature card which authorized the bank to honor checks *82 signed by either of the petitioners or by Bilbrough drawn on the Marble Companys' account with the bank. On September 22, 1950, the bank was also authorized to honor checks signed by I. D. Bilbrough drawn on the account. In a letter to the bank dated February 1, 1954, the petitioners requested the bank to remove their names from its signature card authorizing them to sign checks for the Marble Company since they had sold the company to the Bilbroughs. In January 1954, and prior to the execution of the bill of sale and mortgage agreement on January 15 of that year, petitioner allocated the cash withdrawals, totaling $35,000, which he had made during 1953 from the Marble Company business as follows: $19,200 to interest as representing interest on the $320,000 sale price of the business and the remainder, $15,800, to the down payment on the sale price. In their income tax return for 1953 the Bilbroughs reported the receipt of a salary of $6,000 from Dezendorf Marble Company and that $1,146 had been withheld as tax thereon. In Schedule C "Profit (Or Loss) From Business Or Profession" the business name was shown as "Dezendorf Marble Co." and that the business in 1953 became the successor *83 of a sole proprietorship the name of which was "Dezendorf Marble Co. (E. M. Dezendorf)." A net income of $16,255.23 for 1953 was shown in Schedule C and was included as income in computing their tax liability for 1953. Another schedule dated March 12, 1954, signed by each of the Bilbroughs and attached to their return contains the following: Purchase of DEZENDORF MARBLE COMPANY
Date: January 15, 1954 AS OF January 1, 1953 STATEMENT OF SALE TOTAL PRICE
$320,000.00
Cash on Hand
$ 3,076.00
Accounts receivable
30,500.00
Merchandise: chips, rock,
new bags
45,000.00
Machinery, trucks, plants,
buildings, as shown on
depreciation schedule
144,000.00
Land in Austin
50,000.00
Land in Burnet, Llano,
and Marble Falls, Tex.
5,000.00
Good Will & Patent
39,000.00
$320,000.00
In their income tax return for 1953 the petitioners did not report the sale of Dezendorf Marble Company nor any income from the conduct of that business during that year. However, in their return they reported the receipt of income from interest in the amount of $19,200 from that company. In determining the deficiency for 1953 the respondent determined that petitioners did *84 not sell the Marble Company during 1953, that they realized taxable income of $33,949.08 from the business operations of the company in 1953 and increased the taxable income of the petitioners accordingly. The respondent further determined that since the petitioners did not sell the Marble Company prior to the end of 1953, there was no amount due in 1953 on the sales price thereof and that therefore they realized no interest income in that year respecting the sale transaction and accordingly reduced the petitioner's taxable income as reported for 1953 by the amount of $19,200 which they had reported as interest received during 1953 from the company. Opinion The petitioners have asked that we find that the sale of the Dezendorf Marble Company business and the assets used therein and connected therewith occurred as of midnight December 31, 1952, or January 1, 1953, and that beginning January 1, 1953, the Bilbroughs became and were the owners and operators of the company. They contend that the mortgage agreement executed January 15, 1954, shows that the sale was to be effective on January 1, 1953, and that the deeds and mortgages involved show that the parties could not have "hatched *85 up" the sale during the first few days of 1954. The respondent contends that the sale in question did not occur until January 15, 1954, and that his determination with respect to the issues here under consideration should be sustained. A question presented in Commissioner v. Segall, 114 F. 2d 706 (C.A. 6, 1940), certiorari denied 313 U.S. 562 (1941) was when a sale involved therein occurred. There it was said: There are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in the light of realism and practicality Passage of title is perhaps the most conclusive circumstance. Brown Lumber Co. v. Commissioner, 59 App. D.C. 110, 35 F. 2d 880. Transfer of possession is also significant. Helvering v. Nibley-Mimnaugh Lumber Co., 63 App. D.C. 181, 70 F. 2d 843; Commissioner v. Union Pac. R. Co., 2 Cir., 86 F. 2d 637; Brunton v. Commissioner, 9 Cir., 42 F. 2d 81. A factor often considered is whether there has been such substantial performance of conditions precedent *86 as imposes upon the purchaser an unconditional duty to pay. Commissioner v. North Jersey Title Ins. Co., 3 Cir., 79 F. 2d 492; Brunton v. Commissioner, supra; Case v. Commissioner, 9 Cir., 103 F. 2d 283; United States v. Utah-Idaho Sugar Co., 10 Cir. 96 F. 2d 756. * * * The testimony of Bilbrough shows that during his discussion with the petitioner in December 1952, which was after the petitioner had submitted to Bilbrough a proposed sales agreement which was unacceptable to Bilbrough, the petitioner again proposed to sell Bilbrough the Marble Company business and assets, stating "that he [petitioner] would make an agreement of some kind that would be satisfactory" to Bilbrough. The petitioner's testimony shows that such an agreement was not reached until January 4, 1954. Thereafter, on January 15, 1954, the sale was consummated and title to the business and assets transferred to the Bilbroughs by execution by petitioners of the bill of sale and the deeds to the real estate involved in the transaction. It is true that during 1953 Bilbrough was in charge of operating the Marble Company. However, he was acting in the capacity *87 of an employee and for his services in that capacity he received a salary which was reported as such by him in his income tax return for 1953. The petitioners point us to nothing in the record nor do we find anything therein which indicates that at any time prior to January 1954 Bilbrough or Bilbrough and his wife became unconditionally liable to pay the petitioners the purchase price of $320,000 or any other amount. As we view the situation presented, negotiations for the sale continued during the period from December 1952 until January 4, 1954, when a sales agreement which was acceptable to the Bilbroughs was reached. Prior to the latter date there was no firm agreement obligating the petitioner to sell or Bilbrough to buy. As was said by the Supreme Court in Helvering v. Hammel, 311 U.S. 504 (1941), the term "sale" may have many meanings, depending on the context. In Betty Rogers, 37 B.T.A. 897 (1938), affd. 103 F. 2d 790 (C.A. 9, 1939), certiorari denied 308 U.S. 580 (1939), the question involved was whether there had been a sale of a capital asset with a resulting capital loss. In holding in the affirmative, we concluded that *88 in construing the term "sale" it should be given its ordinary meaning and there adopted and applied the following meaning given the term by the Supreme Court in Iowa v. McFarland, 110 U.S. 471, 478 (1884): "A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." Similarly, in Ralph A. Boatman, 32 T.C. 1188 (1959), and Charles A. Linehan, 35 T.C. 533 (1960), on appeal (C.A. 1, March 24, 1961), involving the question of whether certain sums constituted capital gain or ordinary income, we adopted and applied the foregoing meaning set out in Iowa v. McFarland. We find nothing in the instant case which requires that the term should be given a different meaning here. From a consideration of the entire portion of the record bearing on the question of the sale in the light of what has been said above, we are of the opinion that the sale of the Marble Company business and assets used therein and connected therewith occurred on January 15, 1954. Accordingly the respondent is sustained as to this issue. Since the sale of the Marble Company business and assets did not occur until 1954, we are *89 of the opinion that respondent, having included the income therefrom for 1953 in the income of the petitioners for that year, properly eliminated from the income of the petitioners for 1953 the $19,200 reported by them as interest received in that year on the sale price of the business and property. The respondent is sustained on this issue. Issue 6. Addition to Tax Under Section 294(d)(1)(A) for 1952 for Failure to File Declaration of Estimated Tax. Issue 7. Addition to Tax Under Section 294(d)(1)(A) for 1953 for Failure to File Timely Declaration of Estimated Tax. Findings of Fact The petitioners did not file a declaration of estimated tax for 1952. On April 10, 1953, the petitioner filed with the director in Austin, Texas, a joint declaration of estimated tax for 1953. The respondent determined that for 1952 and 1953 the petitioners are liable for the addition to tax imposed by section 294(d)(1) (A) of the Internal Revenue Code of 1939. Opinion Section 294(d)(1)(A) of the Code imposes an addition to tax in case of failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to be due to reasonable cause and not to willful *90 neglect. Section 58(d)(1)(A) of the Code requires that the declaration of estimated tax shall be filed on or before March 15 of the taxable year, with certain exceptions not shown to be applicable here. The petitioners have the burden as to these issues. The petitioners point us to nothing in the record nor do we find anything therein to indicate that their failure to file a declaration of estimated tax for 1952 and to file a declaration of estimated tax for 1953 within the time required was due to reasonable cause and not willful neglect. The respondent's action as to these issues must be sustained. Issue 8. Addition to Tax Under Section 294(d)(2) for 1952 and 1953 for Substantial Underestimation of Tax. Findings of Fact In the joint declaration of estimated tax for 1953 filed by petitioners on April 10, 1953, the petitioner showed an estimated tax for 1953 of $4,000, making a payment therewith of $1,000. Thereafter, in June and September 1953, the petitioner made additional payments of $1,000 each. The joint income tax return of the petitioners for 1953 was filed on January 14, 1954, showed a tax liability of $5,545, payments made on declaration of estimated tax totaling $3,000, *91 and a balance of income tax due of $2,545. In determining the deficiency in tax here involved for 1953 the respondent determined under section 294(d)(2) an addition to tax of $468.90 for that year computed as follows: Income tax liability
$13,359.94
Less payments on estimated tax
5,545.00
Difference
7,814.94
Total addition to tax sec. 294(d)
(2) (6% of $7,814.94)
468.90
Opinion The respondent determined under section 294(d)(2) of the Code an addition to tax of $1,009.44 for 1952. However, on brief, he concedes that his action in so doing was in error. Accordingly we hold that petitioner was not liable under section 294(d)(2) for an addition to tax for 1952. The petitioners in their petition assigned error as to the respondent's determination of an addition to tax for 1953 for substantial underestimation of income tax for that year and in their allegation of facts in the petition alleged that they would show that they did not substantially underestimate their income tax for the year. Both the assignment of error and the allegation of facts were denied by the respondent in his answer. Section 294(d)(2) of the Code imposes an addition to tax for a substantial *92 underestimation of tax. The petitioners have the burden as to this issue. The petitioners point us to nothing in the record nor do we find anything therein to indicate error in the respondent's determination that the petitioners were liable under section 294(d)(2) for an addition to tax for 1953 for substantial underestimation of tax for that year. Accordingly the respondent is sustained as to this issue. Decision will be entered under Rule 50.