FIRST AMERICAN NATIONAL BANK OF NASHVILLE, Executor, et al.

v.

UNITED STATES of America.

Stirton OMAN et ux.

v.

UNITED STATES of America.

Civ. Nos. 2779, 2780.

United States District Court
M. D. Tennessee,
Nashville Division.

Aug. 29, 1962.

13. McNichol v. Commissioner, 265 F.2d 667.

William Waller (of Waller, Davis & Lansden), Nashville, Tenn., for plaintiffs.

Kenneth Harwell, U. S. Atty., Nashville, Tenn., and George Hrdlicka, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

GRAY, District Judge.

In 1954, John Oman III, since deceased, and his brother, Stirton Oman, were successful operators of a large business in the heavy construction field with headquarters in Nashville. In that year they undertook to put the Foundation Company, a money-losing New York firm in the same field, back on its feet. Because the Omans were already in high income tax brackets, they made it a condition of their acceptance of management posts that they be granted stock purchase options under which they could realize long-

term capital gains if their efforts to pull the company out of the red should prove successful.

The company's stock was selling around $4.00 a share when negotiations began and had risen to $6.00 to $6.50 a share by the time the agreement was concluded with approval of the Foundation Company stockholders July 14, 1954. The contracts with the two Omans provided that they could purchase 30,000 shares each of the company's authorized but unissued capital stock at a future time for $7.00 a share. The contracts were explicitly intended to meet the requirements of internal revenue laws granting tax benefits to optionees under restricted stock options under specified circumstances. Act of September 23, 1950, Chapter 994, Title II, § 218(a), 64 Stat. 942, as amended October 20, 1951, Chapter 521, Title III, § 331(a), 65 Stat. 506, I.R.C.1939, § 130A, 26 U.S.C.A. § 130A, now appearing as I.R.C.1954, § 421, 26 U.S.C.A. § 421.

The Foundation Company prospered under the Omans' direction and its stock was selling around $13.00 a share when a dissident group of stockholders initiated a proxy fight prior to an election of three directors in 1956. The Omans then exercised their options on May 25, 1956, were issued 30,000 shares of stock each on June 4, 1956, and voted the 60,000 shares at the election July 10, 1956, giving a narrow victory to the management slate of directors, including John Oman III. The election was set aside by court order and a new election scheduled for September 28, 1956. In order to end the fight, the Omans indicated their willingness either to buy or sell stock.

Their offer to buy at $15.00 a share was rejected by the dissident group, represented by William F. Thompson and others. The Omans then agreed to sell their 60,000 shares at $13.00 a share if an agreement could be worked out preserving the tax advantages for which they had contracted at the outset. The Omans knew that if they sold their stock within six months after June 5, 1956, when the stock had been transferred to them, their

gain would be taxable as ordinary income in 1956. They therefore specified from the beginning that the sale must be effective after the first of the year 1957.

As a result of the negotiations, two written contracts were signed under date of September 7, 1956. Under one of them the Omans were to sell 53,000 shares of Foundation Company stock to William F. Thompson. Under the other they were to sell 7,000 shares to the Baltimore firm of Stein Brothers & Boyce.

The Thompson contract included provisions to the following effect:

(1) The stock certificates and one-half the purchase price of $13.00 a share in cash or collateral securities were to be placed immediately in escrow with the First American National Bank of Nashville along with Stirton Oman's resignation as a director dated January 4, 1957.

(2) The Omans were to give Thompson irrevocable proxies to vote the stock from the time of the agreement until January 4, 1957.

(3) Thompson could cancel the contract if the management (presumably controlled by the Omans) should do any of certain specified things, without Thompson's permission, before the forthcoming election of directors.

(4) Any stock dividend accruing before January 4, 1957, would be deposited with the escrow agent to be delivered to Thompson at the closing without affecting the purchase price.

(5) The sale was to be closed January 4, 1957, when the escrow agent was to deliver the stock certificates and Stirton Oman's resignation to Thompson in return for a certified check for the balance of the purchase price, and was then to deliver the money to the Omans, after deducting its fee.

(6) If the purchaser should default, the escrow agent was to deliver the stock and the funds and collateral security to the Omans, to be applied on the purchase price, and the Omans would "have any and all additional remedies afforded by law against the purchaser for the enforcement of this agreement or for damages."

The Stein Brothers & Boyce agreement was similar with these principal differences:

(1) There was no provision for depositing collateral in escrow instead of cash.

(2) There was no reference to proxies.

(3) There was no limitation on the Omans' interim management activities.

(4) The purchaser was to receive at the closing not only any stock dividend but also any cash dividend accruing before the closing on January 4, 1957.

(5) There was no provision that the escrow funds should be "applied to the purchase price" in the event of the buyer's default.

John Oman III and the other two management candidates for re-election as directors withdrew their names and Thompson's group took over management of the company after the election. The contracts were carried out to the letter. On January 4, 1957, the balance of the purchase price was paid to the escrow agent by each of the purchasers and the escrow agent delivered to the purchasers the stock certificates, the necessary papers for transferring rights to stock dividends declared during the interim, and Stirton Oman's resignation. The money was paid to the Omans.

The Foundation Company, under Thompson's management, made its income tax returns for 1956 without claiming any deduction for the stock transaction with the Omans as it would have been entitled to do under I.R.C. § 421 if the transaction of September 7, 1956, had been a disposition of the stock. Subsequently the company changed its position on this and sought a refund or credit on the theory that the transactions did constitute a disqualifying disposition under I.R.C. § 421(f).

Meanwhile, the Omans reported their profit from the sale on their 1957 tax returns as long-term capital gains. The Commissioner of Internal Revenue ruled

that the stock was disposed of on September 7, 1956, and the gains were therefore taxable as ordinary income in 1956. The resulting deficiency tax assessments were paid, timely claims for refunds were filed and denied, and these actions for refunds followed within the time allowed by law.

The cases were consolidated for trial and were tried without a jury on July 11, 1962, both sides agreeing that the only issue was whether the effective date of the Omans' disposition of their stock in the Foundation Company was September 7, 1956, when the contracts were signed, or January 4, 1957, when the transaction was formally closed. If the former, the disposition would have occurred within six months of acquisition, disqualifying the transaction for capital gains treatment under I.R.C. § 421(f), and defeating the plaintiffs' claim for a refund. If the latter, the gains would be taxable as long-term capital gains and the plaintiffs would be entitled to a refund.

The plaintiffs' only witnesses were Stirton Oman and an officer of the First American National Bank of Nashville, the escrow agent. The defendant's only witness was Mr. Thompson.

■ At the close of the trial, the court had not ruled on the plaintiffs' objections to four exhibits, marked for identification as Defendant's Exhibits 3, 4, 5, and 6. Exhibits 3 and 4 were proxy solicitation letters sent out by the two factions in August, 1956. Exhibits 5 and 6 were the minutes of two meetings of the Foundation Company directors held between September 7, 1956, and January 4, 1957. These exhibits must be excluded for the same reasons that Plaintiffs' Exhibits 16 and 17 were excluded at the trial. They are not material.

■ At the request of the court, the parties have submitted proposed findings of fact and conclusions of law, and supplemental briefs. Along with these papers, the plaintiffs presented a motion to reopen the case for entry of two additional exhibits. These exhibits, attached to the motion, are the Foundation Company's printed annual statements for 1960 and 1961 containing references to the company's tax claims in relation to the Omans' stock sale.

These exhibits are only cumulative evidence of the government witness's financial interest in the outcome of the lawsuit, already adequately shown on the trial. Furthermore, the evidence of his interest in the trial was only cumulative on the issue of the witness's credibility. The witness had already impeached himself by his demeanor on the stand, by his vague, evasive and contradictory testimony, and by his admission that he had been suspended from the National Association of Securities Dealers in 1943 for violation of a rule requiring that a "member in the conduct of his business shall observe high standards of commercial honor and just and equitable principles of trade." This would have been enough to have required the court to resolve any conflict between his testimony and that of the plaintiffs' witnesses in favor of the latter. Finally, such conflicts as there were on material points probably would have to be resolved in favor of the plaintiffs merely on the basis of the preponderance of the evidence without regard to Mr. Thompson's credibility. The plaintiffs' motion to reopen the case is therefore denied.

■ In considering the merits, the applicable principles are those stated in Commissioner of Internal Revenue v. Segall, 114 F.2d 706, 709 (6th Cir. 1940) cert. denied 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522 (1941), as follows:

"There are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in the light of realism and practicality. Passage of title is perhaps the most conclusive circumstance. Brown Lumber Co. v. Commissioner, 59 App.D.C. 110, 35 F.2d 880. Transfer of possession is also significant. Helvering v. Nibley-Mimnaugh Lumber Co., 63 App.D.C. 181, 70 F.2d

843; Commissioner v. Union Pac. R. Co., 2 Cir., 86 F.2d 637; Brunton v. Commissioner, 9 Cir., 42 F.2d 81. A factor often considered is whether there has been such substantial performance of conditions precedent as imposes upon the purchaser an unconditional duty to pay. Commissioner v. North Jersey Title Ins. Co., 3 Cir., 79 F.2d 492; Brunton v. Commissioner, supra; Case v. Commissioner, 9 Cir., 103 F.2d 283; United States v. Utah-Idaho Sugar Co., 10 Cir., 96 F.2d 756."

In the present case, passage of title occurred January 4, 1957. Transfer of possession also occurred January 4, 1957. The only factor in any debate is whether there had been such substantial performance of conditions precedent as imposed upon the purchasers an unconditional duty to pay.

■ "An unconditional duty to pay," of course, does not mean in this context an unconditional duty to pay immediately. Credit may be extended for the payment of the purchase price of a completed sales transaction, and the property sold may be pledged as security for the payment without destroying the unconditional nature of the duty to pay. It is also true that if this is what actually happened, the parties may not convert it to something else by sham paper writings. But these contracts were not shams. These contracts were hammered out by businessmen who had adverse interests not only as to the ownership and management of the company but also as to the tax consequences of the transaction. It was clearly the intent of all parties that the sales take place for all purposes on January 4, 1957.

Nevertheless, the government contends the contracts actually transferred so many of the incidents of ownership that the buyers were the equitable or effective owners of the stock as of the date of the contract and that nothing remained but paper work on one side and payment of the amount due on the other. The fact is, however, that the Omans did not transfer anything irrevocably on September 7, 1956, except a proxy to vote the stock in the Omans' names for a four-month period. Even the right to interim dividends would not accrue to the buyers until the January 4, 1957 transfer of legal title. The buyers' duty to pay under both of these contracts on January 4, 1957, was a duty to pay upon delivery of the stock, not a duty to pay a debt for prior delivery, and the duty remained conditional until the delivery was actually made or tendered.

As to the 53,000-share transaction, there was an additional condition upon the buyer's duty to pay. Thompson reserved the right to cancel the whole deal without liability if the management should do any of certain things during the three weeks following the date of the contract. It may be contended that this condition disappeared at the end of three weeks, but could it be contended that Thompson could not have brought the matter up at any time before the final closing? If he had attempted to do so on January 3, 1957, who would have exercised the rights of the owners of these shares on January 5, 1957, and during the pendency of any litigation that might have resulted?

■ The court holds that the Omans did not dispose of any of the 60,000 shares of Foundation Company stock they purchased under their options until January 4, 1957, and they were entitled to treat their gains on the transactions as long-term capital gains under the provisions of I.R.C. § 421.

This memorandum will serve as findings of fact and conclusions of law. Counsel will submit an order directing the entry of an appropriate judgment in accordance herewith.