GORDON J. HARMSTON AND ALICE C. HARMSTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8374–71.  Filed November 14, 1973.

*William P. Irwin* and *George F. Belyea,* for the petitioners.
*Joyce E. Britt* and *James Booher,* for the respondent.

222

### OPINION

RAUM, *Judge:* Petitioner entered into two contracts with Jon-Win, in each of which he undertook to purchase from it an orange grove of approximately 17 acres at $4,500 an acre. Each contract was stated to run for a period of 4 years. Both groves were newly planted in the spring of 1967, and it appears to be recognized that it takes 4 years for an orange grove to mature or become established. Under each contract petitioner was required to pay one-fourth of the purchase price ($1,125 per acre) each year, and upon payment of the last installment he was to be entitled to a deed to the property. Meanwhile, under each contract the seller remained in complete control of the property and obligated itself to render services of management and care of the groves during the 4-year period, assuming all responsibility in respect thereof. Such services were extensive, particularly during the first 2 years. The primary question for decision is whether allocable portions of the annual amounts paid by petitioner to the seller may be treated by him as deductible expenses, rather than as installment payments made to acquire established groves as of the end of the contract periods. If petitioner in fact acquired ownership of the groves immediately upon entering into the contracts, there does not seem to be any serious dispute between the parties that he would be entitled to deductions in respect of those portions of the payments that might fairly be allocable to management and care.[9] However, if, as the Government contends, the contracts were in fact executory and petitioner did not become the owner of the groves until the termination of the contracts, the payments made by him would in fact represent nothing more than the non-deductible purchase price for established groves, and the effort to characterize a portion thereof as something else (i.e., fees for management and care) would be of no avail. The real question before us therefore is to determine whether the contracts were executory and whether petitioner in fact paid any management and care fees not-

---

[9] Thus, to the extent that his payments might be allocable to management and care of his own citrus groves he would be regarded as having paid "cultural costs" which he could elect to deduct pursuant to sec. 1.162–12(a), Income Tax Regs. See *Estate of Richard R. Wilbur*, 43 T.C. 322, 324, 328. Although such deductions had been allowed administratively for many years, they were regarded as an "abuse," and were outlawed by sec. 216 of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 573, which added sec. 278 to the Code. See H. Rept. No. 91–413, 91st Cong., 1st Sess., pp. 62–63; S. Rept. No. 91–552, 91st Cong., 1st Sess., pp. 95–96; Conf. Rept. No. 91–782, 91st Cong., 1st Sess., p. 299; 115 Cong. Rec. S15954, S15955, and S15956 (daily ed. Dec. 6, 1969) (remarks of Senator Holland); Staff of the Joint Committee on Internal Revenue Taxation, 91st Cong., 2d Sess., General Explanation of the Tax Reform Act of 1969, p. 97 (Dec. 3, 1970). However, these new provisions do not apply here, because they are specifically made inapplicable to citrus groves planted prior to their enactment.

withstanding the effort in the contracts to describe a portion of the purchase price as consisting of such fees. In our view of the record, the contracts were executory, petitioner did not become the owner of each grove until he made the final payment, and all the installments paid by him were merely nondeductible costs of acquiring two groves which had been brought to maturity after 4 years of management and care.[10]

The question as to when a sale is consummated for tax purposes is a practical one, which must be decided by weighing all of the various factors present in each case. As was stated in *Commissioner* v. *Segall*, 114 F. 2d 706, 709–710 (C.A. 6), reversing on other grounds 38 B.T.A. 43, certiorari denied 313 U.S. 562:

> There are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in the light of realism and practicality. Passage of title is perhaps the most conclusive circumstance. Brown Lumber Co. v. Commissioner, 59 App. D.C. 110, 35 F. 2d 880. Transfer of possession is also significant. Helvering v. Nibley-Mimnaugh Lumber Co., 63 App. D.C. 181, 70 F. 2d 843; Commissioner v. Union Pac. R. Co., 2 Cir., 86 F. 2d 637; Brunton v. Commissioner, 9 Cir., 42 F. 2d 81. A factor often considered is whether there has been such substantial performance of conditions precedent as imposes upon the purchaser an unconditional duty to pay. Commissioner v. North Jersey Title Ins. Co., 3 Cir., 79 F. 2d 492; Brunton v. Commissioner, supra; Case v. Commissioner, 9 Cir., 103 F. 2d 283; United States v. Utah-Idaho Sugar Co., 10 Cir., 96 F. 2d 756. See Options and Sale Contracts in Taxation, 46 Yale Law Jour. 272, 279.

See also *Clodfelter* v. *Commissioner*, 426 F. 2d 1391, 1393–1394 (C.A. 9), affirming 48 T.C. 694; *Morco Corp.* v. *Commissioner*, 300 F. 2d 245–246 (C.A. 2), affirming a Memorandum Opinion of this Court; *Commissioner* v. *Baertschi*, 412 F. 2d 494, 498 (C.A. 6), reversing 49 T.C. 289. The test has also been stated in terms of when the "benefits and burdens" of ownership have passed from the seller to the buyer. See *Dettmers* v. *Commissioner*, 430 F. 2d 1019, 1023 (C.A. 6), affirming 51 T.C. 290; *Ted F. Merrill*, 40 T.C. 66, 74, affirmed per curiam 336 F. 2d 771 (C.A. 9); *2 Lexington Avenue Corp.*, 26 T.C. 816, 822, 824–825. Taking such criteria into account, it is our best judgment that the "ownership" of the properties in question did not pass to peti-

---

[10] An issue raised in the deficiency notice challenging the deduction on the ground that it is not available to petitioner because "The claimed expenses were not incurred in carrying on a trade or business"—i.e., because he was allegedly not a "farmer" within the meaning of the regulations—does not seem to be pressed by the Government on brief, independently of its position that petitioner was "merely a party to a contract for the purchase of a developed citrus grove" and therefore was not a "farmer" in respect of such grove under sec. 1.162-12 of the regulations prior to the expiration of the applicable 4-year period. Accordingly, our disposition of the principal issue makes unnecessary any separate consideration of this point. Similarly, our holding on the principal issue makes it unnecessary for us to reach the question whether the particular allocation claimed by petitioner should be modified.

tioner when he signed the respective "Contract[s] of Sale of Real Property," and that what he got in substance was merely a contract right to acquire ownership upon the expiration of the 4-year periods, provided that he had complied with his contractual obligations.

Although passage of title is not the single determinative factor in deciding when "ownership" has passed under a contract of sale, it is certainly an important consideration. In this case, legal title to each of the properties remained in Jon-Win (seller) during the period of each contract. The contracts specifically provided that they were to remain unrecorded until full payment was received, and that petitioner (buyer) did not have a right to call for a deed until his fourth year payment, *when due*, had been placed in escrow. Thus, under the terms of the contracts petitioner had to wait 4 years before he could demand a deed for the property. Although a "Memorandum of Contract of Sale" was recorded with respect to each contract, which stated that its purpose was "to record the ownership interest of Gordon J. Harmston as purchaser," petitioner still did not have a deed to either of the properties, nor a right to demand one until the end of the contract periods. Moreover, neither "Memorandum" makes clear precisely what petitioner's "ownership interest" was, and it would seem to identify only his contractual rights with respect to the groves. Thus, the real property taxes on both parcels were assessed to, and paid by, Jon-Win, and only Jon-Win claimed deductions for real estate taxes paid with respect thereto, notwithstanding that it was petitioner's practice to claim deductions for real estate taxes paid with respect to his other "farm" properties. Finally, there was no indication on any of the tax bills introduced into evidence by petitioner that Jon-Win was being assessed for the tax on behalf of petitioner in a representative capacity, although California law specifically provides for such indication. Cal. Rev. & Tax. Code sec. 612 (West 1970).[11]

Possession of the two properties, for all practical purposes, also remained in Jon-Win. While it may sometimes be difficult to determine the precise point at which possession of an orange grove passes from the seller to the buyer, the facts of this case indicate quite clearly that Jon-Win retained possession. Petitioner did not have the right to enter either of the properties at any time he wished. Rather, he was only given the right to inspect the properties "at any *reasonable* time during the 4-year term of" the contracts (emphasis added). The contracts also provided that during their 4-year periods the crop

[11] Sec. 612. Representative designation

When a person is assessed as agent, trustee, bailee, guardian, executor, or administrator, his representative designation shall be added to his name, and the assessment entered separately from his individual assessment.

from the groves was to belong to Jon-Win. To be sure, a newly planted grove does not produce any fruit during the first 2 years and the crop is small during the third and fourth years; however, the fact that Jon-Win was entitled to whatever was produced is a matter of more than minimal significance. Moreover, as to the second contract, the grove had already been planted about a year and a half when the contract was entered into, and the fourth year under that contract included the fifth year of that grove's life, when it was reasonable to expect a more substantial crop. Petitioner's right to "sell" the groves amounted to little more than a qualified right to sell his interest in the contracts, and not the absolute right of an owner of property. Thus, even if petitioner sold his interest, he would remain "financially responsible" on the contracts, and could only be relieved of this responsibility upon the submission to Jon-Win of "evidence satisfactory to [Jon-Win] of said [purchaser's] ability to meet the remaining portion of the contract balance."

Other "burdens of ownership" were also borne by Jon-Win. Thus, Jon-Win took the risk of any of the trees dying or otherwise showing themselves to be unhealthy during the period of the contracts. In the event that this should happen Jon-Win was obligated to replace the dead or unhealthy trees with new ones at its own expense. Moreover, although petitioner took the risk of damage to the trees by "acts of God," the most common "act of God" likely to damage the trees, frost, was specifically made the responsibility of Jon-Win, and any tree which was damaged by frost was to be replaced by Jon-Win at its own expense. Indeed, Jon-Win was generally responsible for all damage to the trees from whatever cause, other than "acts of God." It would also seem that Jon-Win bore the risk of condemnation by a governmental authority. Cal. Civ. Code sec. 1662(a) (West 1970) provides with respect to any contract for the purchase or sale of real property, that "unless the contract expressly provides otherwise," if neither legal title nor possession has passed to the purchaser, and a material part of the property is taken by eminent domain, the contract cannot be enforced against the purchaser, who has a right to recover whatever portion of the purchase price he has paid. Since neither of the contracts in issue deals with the rights of the parties in the event of condemnation, the foregoing provisions of the California statute appear to be controlling, and we give but little weight to statements appearing in Jon-Win's minutes that were introduced into evidence suggesting a different burden in the event of condemnation.

It is clear to us that the two contracts were executory and that "ownership" of each grove did not pass to petitioner until the end of the 4-year period relating to it. During such periods, virtually all of the important "benefits and burdens" of ownership—certainly most of

them—remained with Jon-Win. Cf. *Herbert D. Wiener*, 58 T.C. 81, 92–94. Accordingly, the payments made by petitioner must be regarded simply as his cost of acquiring the groves and cannot be treated in any part as representing expenditures made by him for management and care of the groves. In the circumstances, we do not reach the question whether the allocation spelled out in the contracts and claimed by petitioner correctly reflected such expenses, although we do note that they appear to be unrealistic and tend to emphasize the spurious nature of petitioner's principal contention.

In support of their position, petitioners have argued vigorously that Jon-Win retained legal title simply as a security device, akin to a mortgage, and that the contracts actually transferred ownership to petitioner when they were executed. Reliance is placed upon California law that ownership may thus be transferred even though legal title is retained by the seller as a security device until the buyer has paid the full purchase price. See, e.g., *Venable* v. *Harmon*, 233 Cal. 2d 297, 43 Cal. Rptr. 490. Of course, we fully agree that where the purchaser takes possession, pays the real estate taxes, and assumes the burdens and benefits of ownership, such a contract can operate merely as a security device and the purchaser will be regarded as the owner, notwithstanding that legal title remains in the seller. But where, as here, nearly all the important burdens and benefits of ownership remain with the seller, there is presented an entirely different picture. Here, Jon-Win remained in control of the properties and petitioner was given the right to enter thereon merely for inspection and only at "reasonable" times. Furthermore, Jon-Win assumed the farming risks and burdens of the venture, including all fertilizer, insecticide, and labor costs (together with payroll taxes and workmen's compensation costs), utility bills, water supply, frost protection, planting and replacement of trees (damaged by frost or any other cause other than "acts of God"), liability insurance, real estate taxes, and the obligation to provide the necessary management and supervision so that a mature or established grove could be turned over to petitioner at the end of the respective 4-year periods of the contracts. At the same time Jon-Win retained such benefits of ownership as the right to the crops, which, although perhaps of minor financial importance in the case of the first contract, could have been substantial in the case of the second contract, and was nevertheless significant. On the facts before us, it is plain that the contracts were no mere security devices. They were executory; ownership remained with Jon-Win until petitioner paid for the groves in full; and the payments in issue consisted merely of his nondeductible expenditures to acquire mature or established groves at the end of the contract periods. No part of those payments represented any deductible amount paid by petitioner for management and care.

*Decision will be entered for the respondent.*